Argued June 10, disbarred July 8, 1959

IN RE COMPLAINT AS TO THE CONDUCT OF

# OTTO W. HEIDER

*Peter M. Gunnar* and *Richard D. Lee*, Salem, argued the cause and filed a brief for the Oregon State Bar.

*William E. Dougherty*, Portland, argued the cause for Petitioner. With him on the brief was Jack H. Cairns, Portland.

Before ROSSMAN, Presiding Justice and LUSK, WARNER, SLOAN, O'CONNELL, CRAWFORD and MILLARD, Justices.

PER CURIAM.

This matter comes before the court on the petition of Otto W. Heider, a member of the Oregon Bar, for review of the findings and recommendations of the Board of Governors of the State Bar, pursuant to ORS Title 1, Chapter 9. The petitioner was found guilty of ten of fifteen charges of professional misconduct and the Board recommended permanent disbarment.

Mr. Heider was admitted to the Oregon Bar in 1915 and has practiced continuously in this state since his admission. He has also pursued an active and profitable financial and business career which he has conducted along with his law practice, and it is this combination of interests, at times conflicting, that to some extent explains this proceeding.

On February 8, 1957, the Oregon State Bar filed its complaint charging petitioner with conduct "which at the time thereof, was, and now is, unethical and in violation of the Rules of Professional Conduct made and promulgated by the Oregon State Bar, and constitutes such conduct that, if the accused now were applying for admission to the Oregon State Bar, his application ought to be denied." On March 2, 1957 issues joined on the complaint and amended answer

were heard before a Trial Committee, accused appearing in person and by counsel and the Oregon State Bar by its prosecutors. April 14, 1958, the Trial Committee found the accused guilty of five of the said charges and not guilty of ten, and recommended suspension from the practice of law in the State of Oregon for the period of one year. On June 5, 1958 the Board reviewed the record, considered the findings and recommendations of the Trial Committee and concluded "The conduct of the accused herein, Otto W. Heider, was and is in violation of the rules of professional conduct made and promulgated by the Oregon State Bar and was and is such conduct that, if the accused were now applying for admission to the Oregon State Bar, his application would be denied." The Board found the accused guilty of ten of the charges, not guilty of five. The Board disapproved and rejected the recommendation of the Trial Committee and recommended to this court that "the accused Otto W. Heider, be permanently disbarred from the practice of law in the State of Oregon." Hence this petition for review.

We find Trial Committee and Board in agreement that accused was guilty of five charges and not guilty as to five, and in disagreement as to the remaining five charges. In our review we shall consider only the ten charges on the basis of which the Board of Governors recommended the permanent disbarment of the accused and from which recommendation this review is prosecuted. In summarizing them we adopt the numbering of the complaint. There is little dispute as to the facts; motivations, intent and implications supplying the issues.

■■ *Second.* "Profiting from and failing to account to probate court and clients for profits made by him, upon funds of estate for which he was attorney."

(Emil Arndt estate.) The admitted facts are these: Petitioner, while acting as attorney for the executrix of the Arndt estate in its probate administration, sold to the executrix certain mortgages and contracts and also invested funds of the estate in like paper. He would guarantee the principal and interest, one to three per cent less than was called for. He would collect the indebtedness and pay the proceeds to the executrix less the interest differential. This was done with the knowledge and consent of the executrix who understood the difference retained by the petitioner was in payment for his personal guaranty. He claimed this discount was justified as consideration for his guaranty and expenses of collection. The Trial Committee found the accused not guilty, with an explanatory statement. For over thirty years Mr. Heider had been friend and adviser to the Arndt family and drifted into an equivocal combined business and professional relationship from which a conflict of interests might easily and in fact did, arise. This practice persisted for many years, the accused, in effect, employing the estate as a capital asset in the promotion of his own private business. He has produced no understandable and dependable records or accounting of funds so used. His long friendship with the Arndt family and confidence placed by reason thereof created a situation in which the maintenance of adequate records was both legally and ethically imperative. This was not done. It seems impossible to strike a satisfactory balance between the Arndt estate and the Heider business. As witness the Herculean efforts of the Bar prosecutors to bring coherence to his records. In this respect petitioner grievously erred. He admittedly profited from personal dealing with his client while maintaining the semblance of a professional relationship. He utilized his legal repre-

sentation of the estate to promote his personal interests. The attorney-client relationship was subordinated to the business and financial aspects of his livelihood. He has retained the profits so realized. And it seems impossible to make an accurate accounting. The fact that the executrix and heirs make no complaint is of little consequence in the evaluation of this practice in its aspects to legal ethics. The professional relationship does not and should not contemplate such a course of dealing with intermingling of funds. Implicit in the situation was susceptibility to influence and a perversion of the attorney-client relationship. The professional relationship does not contemplate and accept the practice of law as embracing and countenancing this course of conduct. So many transactions were involved it would be unrealistic to conclude the client did other than blindly rely upon the attorney who, while representing the estate, was acting in his own interests as well. We find accused *guilty* of this charge.

■ *Third.* "Commingling of funds." Both Trial Committee and Board found petitioner guilty of this charge. (The Trial Committee found "technical" guilt.) There was a clear violation of Rule 9 of the Rules of Professional Conduct. Again, this was a practice existing through the years with mutuality of understanding, lending support to the Trial Committee's description of the guilt it found as "technical." Such conduct, however, cannot be condoned, not only because it is in express violation of the rule, but due to the fact that it creates ready-made a situation not only making misappropriation and embezzlement easy, but actually suggesting and inviting it. This practice is so easily begun and so difficult (at times) to abandon that we are caused to make the observation that this rule is perhaps one of the most important of them all, in the rigid ad-

herence to which much worry, anxiety and embarrassment may be avoided. In its violation much trouble is conceived. *In re Schmalz,* 169 Or 518, 129 P2d 825. We find the accused *guilty* of this charge.

■ *Fourth.* "Gross negligence in conducting probate." (Arndt estate.) The Trial Committee found the accused guilty of misfeasance but did not find his conduct unethical. The Board found him guilty of professional misconduct in failing to file proper annual accountings and final account. That such conclusion is to be drawn from the record is crystal clear. While no act of moral probity is here involved, the fact remains the accused was guilty of procrastination and delay far exceeding any necessity. This estate remained open for 28 years. Records were so inadequate that death or illness might have seriously jeopardized the interests of the beneficiaries, with the resultant liability on the attorney. Accurate accounting was impossible under records kept. A proper sense of responsibility to the interests he served would have dictated decisive action within recognized time limitations. Such delay was fraught with possibilities of serious consequences unnecessarily invited. Such conduct must be regarded as professional misconduct. We find the accused *guilty* of this charge.

■ *Seventh.* "Tampering with evidence." It is alleged petitioner as a witness in a criminal case tampered with evidence in that he erased his pencil notation from the back of a documentary exhibit. The Trial Committee found the petitioner not guilty with an explanatory statement that he "acted impetuously and unthinkingly." He was a witness for the prosecution on the trial in which he had an indirect interest. During recess he started to erase a pencil mark he considered

irrelevant on the back of an instrument he had produced in evidence as a witness. He was stopped and the notation was restored. He was reprimanded by the court. He avers no purposeful intent to alter an exhibit but rather a thoughtless, impulsive act without due consideration. However, to accept such explanation as complete exoneration would be to condone and imply approval. His action evidenced an utter disregard of and unprofessional concern for established rules and practices. *Guilty.*

■ *Eighth.* Both Trial Committee and Board of Governors found the accused guilty of the eighth cause of complaint. This reads:

"II

"On 14 February 1956, during the trial before the Circuit Court of the State of Oregon for the County of Yamhill of that certain cause entitled 'ROBERT GUMM, Plaintiff, v. OTTO W. HEIDER, Defendant', register number 19644, then therein pending, said defendant therein being the same person as the Accused herein, and after the jury had been chosen, formed and sworn, and their identities known to the Accused, and during the noon recess of said court in the proceedings of said trial, the Accused did seek out, approach and converse privately with one of the members of said jury, to wit: Frank Johnson, to the Accused known to be a salesman of life insurance policies (as the fact was); and, with the purpose and for the effect of causing said juror to act in a manner favorable to the accused in said cause, the Accused then and there did offer to said juror that he, the Accused, would affirmatively act in such manner as to cause said juror to receive financial gain from said affirmative action of the Accused, to wit: The Accused offered to provide said juror with a specific opportunity to sell a life insurance policy of the face amount of $10,000 to a person unknown to said

juror and of the acquaintance of, and capable of being influenced by, the Accused.

"III

"The aforesaid conduct of the Accused then was and now is unethical and in violation of the rules of professional conduct made and promulgated by the Oregon State Bar, and constitutes such conduct that, if the Accused now were applying for admission to the Oregon State Bar, his application ought to be denied."

Frank L. Johnson testified before the Trial Committee, as follows:

"BY MR. LEE:

"Q Will you state your full name, sir?
"A Frank Johnson.

"Q And your residence address?
"A Route 2, Box 1, McMinnville.

"Q And your occupation, sir?
"A I am a salesman of real estate and life insurance.

"Q How long have you been selling real estate and life insurance?
"A I would say approximately six, maybe seven years.

"Q Are you personally acquainted with Mr. Otto Heider?
"A Yes, sir.

"Q And how long have you known him?
"A Probably 30 years.

"Q Just to deviate for a moment, we understand that you were thrown by a horse yesterday; is that right?
"A That's right, sir.

"Q You are in some pain?
"A Quite a considerable amount.

"Q Several ribs were broken?
"A That's right.

"Q Mr. Johnson, in the trial of Robert Gumm, Plaintiff vs. Otto W. Heider, Defendant, in the Circuit Court of the State of Oregon for the County of Yamhill, register number 19644, you were a member of the jury, were you not?

"A That's right.

"Q And that trial commenced on the morning of 14 February 1956?

"A I couldn't remember the dates exactly, but I remember the case.

"Q Now were you questioned on your qualifications to serve as a juror that morning?

"A That is right.

"Q Was Mr. Heider represented by counsel in that matter, do you recall?

"A I believe that—I believe he had counsel. I can't remember the man's name, but he was, he is some State official.

"Q Was the fact that you were a salesman of life insurance brought out on the questioning that morning?

"A That's right. They asked me my occupation, and I told them life insurance selling.

"Q Mr. Heider was present in the courtroom that morning, was he not?

"A That's right.

"Q Now had the jury been selected, formed, and sworn by noon of that first day, do you recall?

"A I believe that's right, yes.

"Q And to your knowledge had the identities of the members of the jury been known to Mr. Heider?

"A That's right.

"Q Prior to noon of that first day?

"A That's right. The jury had been selected before noon, yes, sir.

"Q And was a recess taken for lunch, I suppose?

"A That's right.

"Q Did you eat lunch that day?

"A I ate lunch at the Elks Club.

"Q And where was that, sir?

"A In McMinnville.

"Q Did you see Mr. Heider at the Elks Club that noon?

"A When I went to the Elks Club, I went to the lavatory, and almost immediately after I got in the lavatory Mr. Heider came in.

"Q Did you talk with him, sir?

"A That's right.

"Q Would you tell the Trial Committee now exactly what was said during your conversation with Mr. Heider and the circumstances of your meeting with him?

"A I went into the lavatory, and just a minute after or something like that, after I went in, Mr. Heider came, and because we had known one another for a long time, he said, 'Frank, I did not know you were selling life insurance,' and I said, 'Yes, I have been a life-insurance salesman for several years,' and he said, 'We don't have anybody up around Sheridan selling life insurance,' and he said, 'I run into a prospect occasionally. If I did, I can probably turn you some business.' He said, 'In fact, if you'll make a proposal on a man 32 years of age and bring him up to my office on Saturday, I will guarantee you will sell $10,000 of ordinary life at that time.' And I thanked the man, and that was about the extent of our conversation.

"Q Who started the conversation, Mr. Johnson?

"A Mr. Heider started the conversation.

"Q Was there anyone present in the lavatory other than you and Mr. Heider?

"A No, sir.

"Q Did he mention a specific policy of life insurance?

"A He said ordinary life for a man 32 years of age.

"Q Did he give you any indication of the amount of the policy?

"A $10,000.

"Q Upon leaving, did Mr. Heider make any statement to you?

"A Mr. Heider said, 'Don't mention this to anybody.'

"Q How did Mr. Heider act as he was talking with you in the lavatory?

"A Well, when he opened the conversation and—he looked around to see that nobody was there, and then he said not to mention this to anybody, he took another look around and said, 'Don't say anything about this to anybody.'

"Q Did you report this incident to anyone?

"A Not until after the trial was completed.

"Q To whom did you report the incident?

"A Well, the day after the trial was completed, I went up to the D.A.'s office, the district attorney, who was Elliott Cummins, and reported that to him at that time.

"Q Now do you recall what date you went to Mr. Cummins' office?

"A I can't tell you exactly, but it was the day after the trial was completed.

"Q Now had a verdict been brought in?

"A It had.

"Q Prior to your going to Mr. Cummins?

"A That's right, it had, yes.

"Q What was the reason for your delay in reporting this incident?

"A I didn't know what to do, confidentially, and I didn't want to try to influence anybody on the jury or anything, so I waited until the case was completed and then reported it.

"Q Did you mention this incident to anyone other than Mr. Cummins?

"A Nobody.

"MR. LEE: No further questions."

On cross-examination the witness testified he thought Mr. Heider first learned the witness was selling insurance at the time of the selection of the jury; that during trials many persons congregate in the Elks Club for lunch; that he did not think anything in the conversation affected his judgment of the facts; that a substantial verdict was returned against Mr. Heider.

Otto W. Heider testified as follows with reference to this incident:

"BY MR. DOUGHERTY:

"Q Now Mr. Heider, on or about 14 February 1956 were you the defendant in a trial in the Circuit Court in Yamhill County of a cause called 'Robert Gumm, Plaintiff against Otto W. Heider, Defendant'?

"A I was.

"Q You knew that Mr. Johnson, Mr. Frank Johnson was on the panel, on a jury panel?

"A Oh, yes.

"Q You have known Mr. Johnson for about how many years?

"A Oh, for over 30 years.

"Q Have you had business dealings with him?

"A Yes.

"Q  Was it brought out in the course of the inquiries to the panel that he knew you?

"A  Yes. He admitted he knew me.

"Q  And the general nature of his acquaintance with you was brought out?

"A  Yes.

"Q  Subsequently at the Elks Club in McMinnville, did you have a conversation with him?

"A  Well, yes. He started the conversation with me, but we did have a conversation.

"Q  You did have a conversation?
"A  Yes.

"Q  And that was during the noon recess?
"A  Yes.

"Q  And were various lawyers, witnesses, and jurymen at the Elks Club for lunch that day?

"A  Yes. They usually always are.

"Q  Yes. Now then, generally, so far as you can recall, what was the conversation that you had with Mr. Johnson?

"A  Well, Mr. Johnson—the conversation was in the lobby of the Elks Club, and he just mentioned to me rather casually if I wrote any insurance or life insurance, and I told him no, that I didn't, and I told him I didn't know anyone in Sheridan that was writing life insurance; and he asked me in case I had anybody, if I didn't have any other preference, if I did have anybody that wanted life insurance, would I refer them to him, and I told him it didn't make any difference to me, I usually had very little to do with life insurance, it didn't make any difference to whom I referred them to, because—and in fact, I did not know that he was writing it, like he mentioned in his examination, and I made no proposals to him, and I had no

one in mind. I don't think he did, but I did say that in response to his question, that he wanted to know, and—if I did, if I had no preference, if I would refer them to him; and I told him it didn't make any difference to me, and I walked away from him. That was about the extent of our conversation.

"Q The verdict in that case was against you, Mr. Heider?

"A Yes.

"Q And Mr. Johnson served as a member of the jury?

"A I think he was foreman, and the verdict was $30,000.

"Q And Mr. George Neuner represented you in that case?

"A That's right.

"Q You were speaking about Sheridan. Is that where you maintain your office?

"A I have lived there all my life.

"Q You maintain your office there?

"A I do.

"Q And do you have any other occupation, other than your profession of attorney?

"A Oh, I do a little farming on the side and do a small investment business.

"Q Was there anything in your conversation with Mr. Johnson which would not be normal in a conversation between two business men in a community such as you and he, who had known each other for 30 years and had had business dealings together?

"MR GUNNAR: I object to that question. I think it calls for an opinion of the witness which is unwarranted in this particular proceeding.

"THE CHAIRMAN: The objection will be overruled.

"THE WITNESS: Nothing at all. I—after we started our conversation, the reason I made the conversation very short was that it occurred to me about it being a jury, and that's why I walked away, it being a juror. When he approached me, I didn't want to appear to be unfriendly. I just answered him as briefly as I could and walked away.

"MR. DOUGHERTY: I have no further questions.

"MR. LEE: Just one moment.

## "CROSS-EXAMINATION

"BY MR. LEE:

"Q One question, Mr. Heider. Didn't you feel that it was improper to talk to a member of a jury?

"A I think when he approached me, and came over, and shook hands with me, that I possibly should have ignored him completely. I probably should have walked away from him and had no conversation with him at all. On account of knowing him as long as I had, and he came over and shook hands with me—well, I should have at that time walked away and not even had any words with him at all. I suppose that would be proper, but I didn't. When he asked me about insurance, why, I did not know whether—I did not know whether to appear unfriendly and ignore him, or just what to do. I should have done perhaps as you suggest, ignored him.

"Q Did you report this conversation to anyone, Mr. Heider?

"A I didn't report it to anyone at all, because I didn't consider the conversation of any sig-

nificance or importance. In fact, it never occurred to me again after that time, except this way. About three or four days after the jury come in, as I recall, Mr. Johnson called me up and wanted to know if I had any prospects that he could come to Sheridan and see, and I told him I didn't have any in mind, but if—since the case was over with, I did tell him again that if I had any need for his services, I wouldn't mind referring the parties to him, because I don't write insurance. Now I say three or four days. It could have been a week after the jury came in. He called and asked if I had any one person in mind, and I still didn't have anyone in mind.

"Q How many times did he call you?

"A I think only once, he called me.

"Q You recall testifying, do you not, Mr. Heider, before the Grievance Committee on 8 June 1956 at 7:00 P.M. in the Yamhill County Courthouse in McMinnville, Oregon?

"A Yes, I was a witness.

"Q Do you recall giving testimony in connection with this particular cause of action?

"A I think it came up then. I don't think Mr. Johnson was there, though.

"Q No.

"A I don't recall.

"Q At page 39 of that transcript, 'Mr. Heider'—this is your statement on page 39, about two-thirds of the way down; these lines are not numbered, so I cannot give the number—this is your statement: 'MR. HEIDER: Since he asked me about this, he has called me up twice and says, Why don't you give me that prospect that you had?'

"A Well, it could be twice.

"Q You are not sure, then, are you?

"A Well, I know he called me once, and it could be very well that he called me twice about it, but my recollection right now is, it was specific about one conversation, but he could have called me twice.

"MR. LEE: No further questions."

The juror Johnson, recalled, testified he telephoned accused from the office of the district attorney, Elliott B. Cummins, the day following the trial "to find out what his attitude was on this thing and whether or not he would incriminate himself further * * *." He testified that Mr. Cummins, Mr. Devlin or he himself may have suggested it. He asked Mr. Heider "about the insurance deal that he had talked to me about, * * *." Mr. Heider declared the verdict against him was a terrible miscarriage of justice but "nothing was said at all about life insurance."

The Trial Committee in its findings made the following observation:

"The trial Committee was impressed with the substance of the testimony of witness Johnson and the manner in which he testified. His credibility was not impeached. In order to reject his testimony it would be necessary to conclude that the witness had invented the incident out of his imagination. His version of what occurred is both plausible and reasonable. Under the circumstances it is not unlikely that the accused was anxious to gain the favor of one who was sitting in judgment upon him. There is corroboration in the fact that the accused admits that the witness telephoned him on at least one or two occasions following the trial for the purpose of inquiring about the alleged prospect. There would have been no reason for the witness to have telephoned the accused about this matter unless it had been discussed previously between them."

We find the accused *guilty*. The implication of such conduct must be clear.

*Goodeve v. Thompson*, 68 Or 411, 136 P 670, 137 P 744, involved a situation comparable to that before us. Misconduct of plaintiff and a juror in meeting and conversing was held to justify a motion for a new trial. The court spoke as follows:

> "* * * A perusal of the evidence taken on the hearing on the motion to set aside the judgment is convincing that the conduct of the juror Wallis in meeting and conversing with the plaintiff under the circumstances disclosed was misconduct on the part of both the plaintiff and the juror; * * *

> "* * * It is said in Davidson v. Manlove, 2 Cold. (Tenn) 346: 'Such conduct on the part of a suitor is highly improper and reprehensible, and should call forth the severe censure of the court. Men must not be permitted to tamper with jurors before whom their suits are being tried; and, being seen in close conversation with them during the trial, or while they are considering of their verdict, the circumstance, unexplained, is sufficient to authorize the circuit judge to grant a new trial, and to subject the party to punishment by the court for contempt. The fountains of justice must be kept pure and free from suspicion, or the citizen will lose all respect for the laws, and the rights of person and property will become insecure. Suitors and jurors must not place themselves in a position where their conduct creates suspicion.'" *Goodeve v. Thompson*, 68 Or 411 at pages 414 and 415.

■ *Ninth.* "Knowingly materially altering a negotiable instrument." This charge as laid in the complaint reads:

"III

"On or about, to wit: 3 December 1955, the Accused had received a negotiable instrument, to wit:

a bank check, executed by the law firm of Hayter & Shetterly, by Beverly Hood, for the sum of $1,785.46, in their capacities as attorneys for the vendees under said contract, which said sum so forwarded was in full payment of that certain installment upon said contract due on 15 November 1955.

## "IV

"Upon the face of said negotiable instrument there appeared the following explanatory notation, to wit: 'Nov. 15, 1955, installment on Hougham-Raines contract.'

## "V

"Thereupon, without the knowledge, direction or consent, and against the wishes, of the makers of said negotiable instrument, and each of them, the Accused did willfully, maliciously and fraudulently alter said negotiable instrument by changing the last period therein to a comma and by adding to said explanatory notation the following word, to wit: 'part', so as to cause said notation to read 'Nov. 15, 1955, installment on Hougham-Raines contract, part'.

## "VI

"Thereupon, the Accused did utter said altered instrument by presenting to the drawee bank named in said negotiable instrument for payment said negotiable instrument so willfully, maliciously and fraudulently altered, and, from said drawee bank, did receive payment thereof."

A letter accompanying the negotiable instrument referred to reads, in part:

"* * * I therefore enclose my check payable to your order in the sum of $1,785.46 to cover the con-

tract installment which fell due November 15, 1955, and which I have computed as follows:

| | |
|---|---:|
| Principal installment due 11/15/55 | $1,806.25 |
| Less credit for work performed by Frank Raines for G. R. Munkers pursuant to written instructions of Roland Hougham dated 11/27/54 | 240.00 |
| Balance of principal due 11/15 | 1,566.25 |
| plus interest at 6% from 10/20/54 | 219.21 |
| Total due this fall | $1,785.46 |

In explanation of the credit of $240 claimed above, I enclose a copy of Mr. Hougham's authorization to Mr. Raines to do 40 hours of bulldozing for Mr. Munkers and agreeing to give credit for the work done. By letter of November 13 Mr. Munkers acknowledged that the full 40 hours of bulldozing had been furnished by Mr. Raines as agreed. The agreed rate for this work was $6.00 per hour, or a total of $240, as claimed above.

I might add that Mr. Hougham evidently claims that this credit should be applied on another contract for the sale of land to Mr. Raines rather than the equipment contract. However, as you will note from the enclosed authorization for the work, the item to which it should be credited is not specified and the Raines therefore exercise their right to elect to credit it upon the machinery contract. Their work under the contract was completed before they received any notice that Mr. Hougham had sold, assigned or otherwise disposed of his interest in the machinery contract.

If after checking the matter again you still find that you are not the owner and holder of the equipment contract in question, please return my enclosed check with any information you may have as to its subsequent negotiation or the name and address of the present holder of the contract. If,

on the other hand, you find that you are the owner and holder, you are, of course, authorized to endorse and accept the enclosed payment to cover the 1955 installment. After crediting this payment Mr. Raines' records show that the balance due on the contract is $1,806.25, with interest thereon at the rate of six per cent per annum from November 15, 1955, which will fall due November 15, 1956.

Very truly yours,<br>Philip Hayter".

Petitioner admits the incident but claims he altered the instrument without fraudulent intent but in assertion of his own side of the argument, over the amount due. We find the accused *guilty.*

■ *Tenth.* "Knowingly communicating with adverse party whom he knew to be represented by counsel." It is alleged accused was guilty of unprofessional conduct in that as a private creditor he communicated directly with his debtor, knowing the latter was represented by counsel. The Trial Committee found accused guilty. Again, the dual relationship of private business man and attorney is drawn upon to justify this disregard of professional practices, and again, we cannot but conclude accused is guilty of misconduct. If accused chooses so to intermingle his professional and his personal financial and business interests, he cannot escape the responsibility attaching thereto. *Guilty.*

■ *Eleventh.* "Misleading court in pleading." Rule 16, Rules of Professional Conduct. It is alleged petitioner was guilty of unprofessional conduct in that he misstated in a complaint prepared by him in a suit for annulment of marriage, in effect, that the waiting period following a divorce was the same under the law of Missouri as under the law of Oregon, and later so

stated to the trial judge. The Trial Committee found accused guilty, with an explanation:

> "The evidence is clear that the accused represented to the Court the law of another State without knowing in fact whether the law of that State was, or was not, as represented. The accused made no attempt to apprise himself of the truth or falsity of his representation until the issue was raised by the District Attorney and the Trial Judge. The accused testified that his client told him what the law was in Missouri and that he relied upon this statement. It is to be noted from the transcript of the divorce proceeding that in the presence of the accused his client testified that the accused informed him as to the law of the State of Missouri. This went unchallenged in the divorce hearing and was not denied in the trial of the accused."

The explanatory note to the Trial Committee's findings of guilty sets forth our own conclusions. Accused either intentionally sought to mislead the court or made the statement in pleading and to the court with reckless indifference as to its truth or falsity and without effort to inform himself. And only did he seek the fact after the court advised him it would take the matter under advisement. The circumstances surrounding petitioner's conduct relative to this charge clearly indicate a fraudulent motive and purpose, either actively or in such wanton disregard of the truth as to be fraudulent in the eyes of the law. *Guilty*.

▇ *Twelfth*. "Misleading court upon trial." *Guilty* for same reasons.

▇ *Fifteenth*. "Exhibiting in causes second, third, fourth, seventh, eighth, ninth, tenth, eleventh, and twelfth above such course of conduct as to warrant disbarment." *Guilty*.

We proceed to a consideration of penalty. ORS 9.480 reads, in part:

"An attorney may be disbarred or suspended by the Supreme Court for any of the following causes arising after his admission to practice:

\* \* \* \* \*

"(3) Wilful deceit or misconduct in his profession.

"(4) Wilful violation of any of the provisions of ORS 9.460."

And from ORS 9.460:

"An attorney shall:

\* \* \* \* \*

"(4) Employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statement of law or fact;

\* \* \* \* \*"

We have found the accused guilty of violations of Rules of Professional Conduct, as follows:

1. Rule 9: "A member of the state bar shall not *commingle* the money or other property of a client with his own, and he shall promptly report to the client the receipt by him of all money and other property belonging to such client."

2. Rule 11: "A member of the state bar shall not *communicate* with a party represented by counsel upon a subject of controversy in the absence and without the consent of such counsel. \* \* \*"

3. Rule 16: "A member of the state bar shall not intentionally *misquote* to a judge, judicial officer or jury the testimony of a witness, the argument of opposing counsel, or the contents of a document, nor shall he intentionally *misquote* to a judge or judicial officer the language of a book, statute or

decision; nor shall he, with knowledge of its invalidity and without disclosing such knowledge, cite as authority a decision which has been overruled or a statute which has been repealed or declared unconstitutional."

4. Rule 18: "* * * A lawyer shall never *converse* privately with any juror about the case and both before and during the trial he shall avoid unnecessary communications with them even as to matters foreign to the cause. * * *" (Emphasis ours.)

We have found the accused guilty of the following misconduct:

1. *Profiting from* and *failing to account* to probate court and clients for profits made by him upon funds of the estate for which he was attorney.

2. *Altering* a negotiable instrument by adding the word "part" to this notation on a check, "* * * installment on Hougham-Raines contract."

3. *Erasing* a penciled notation from the back of a documentary exhibit.

4. With respect to *delay* in his handling of the Arndt estate.

Otto W. Heider has subordinated the concept of his profession as one of service to its consideration and employment as an aid in the promotion and furtherance of his business and financial interests. And in so doing, the law has assumed increasingly less importance, and money-making has become his paramount concern. He has become indifferent to the high concept of his profession and its precepts as established by ethical codes and as generally observed by its members. He has used the law as an agency for advancement of his own personal interests, regardless of conformity to established and recognized ethical ideals.

We may say we are not impressed with petitioner's assertion suggestive of a dual personality; the one a man of business and finance, the other, and apparently a secondary concept, a lawyer. How it may be argued that in the capacity of business man he may indulge in practices generally condemned with reference to attorney and client relationships, when the circumstances show such intimate relationship as to make the two practically inseparable, we do not know.

When an attorney so intermingles these two aspects of his livelihood, promoting each by reliance upon the other, he cannot escape responsibility for conduct by averring he was acting in his business capacity and that his actions are to be evaluated and judged by the standards of the competition of the market place, rather than by those of his profession. *Law is not a business. It is a learned profession.* Under the facts of this case there is no cleavage or separation of responsibility for petitioner's acts as a business man and as a lawyer. He may not employ and accept the benefits of such intermingling of activity involving both law and business without assuming responsibility for both. Further, the fact that no one was injured by his conduct is fortuitous only and of no significance so far as this hearing is concerned. Embarrassment, injury and discredit were implicit therein.

On the basis of our conclusions of guilt as above stated and our evaluation of the entire record in this case, we find petitioner guilty under this count and approve the recommendation of the Board of Bar Governors. It appears to the court that his conduct has been such that if he were applying for admission to the Bar his application should be denied. It is ordered that Otto W. Heider be permanently disbarred from the practice of law in the State of Oregon. ORS 9.470.

We take occasion to express appreciation for the assumption of a most arduous, exacting, difficult and uncompensated assignment by the Bar prosecutors. They have discharged this responsibility in accord with the best traditions of our profession.

Mr. Justice Rossman sat at the argument, but took no part in the decision of this case.