Argued and submitted October 9, accused suspended December 4, 1984, rehearing denied January 29, 1985

In re Complaint as to the Conduct of

# RAY G. BROWN,
*Accused.*

(OSB 82-89; SC S30283)

692 P2d 107

Richard G. Dobbins, Portland, argued the cause and filed the briefs for accused. With him on the briefs was Dobbins & McCurdy, Portland.

Mark McCulloch, Portland, argued the cause for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed a complaint against Ray G. Brown accusing him of unethical conduct in two separate causes. The first cause accuses Brown of improperly advancing money to a client. The second cause alleges that Brown created false evidence by obtaining from the client an affidavit denying the advancement of the money.

The Bar's complaint was served on March 15, 1983.[1] The Trial Board found Brown not guilty of both causes. The six member Disciplinary Review Board found Brown not guilty of the first cause and guilty of the second cause. We find Brown guilty of both causes.

For approximately 25 years prior to this incident, Brown represented the mother and father of Deonna Anderson. On occasion he had loaned them money. On October 2, 1981, when Anderson was approximately 25 years of age, she was involved in an automobile collision. On November 16, 1981, she employed Jarvis B. Black, a Portland lawyer, to represent her in connection with her claim for personal injury and property damages resulting from the collision. Thereafter Anderson requested that Black loan her some money. He refused.

On January 27, 1982, Brown loaned Anderson the sum of $35.00. Sometime on the same day or the following day, Anderson went to Black's office and told him that she wanted Brown to represent her because "Brown had agreed to loan her money against the settlement or judgment in the event [her case] went to trial."[2] Black agreed that he would transfer the file and told Anderson to come back in a day or two. On January 29, 1982, Anderson returned to Black's office and signed a receipt for the file which included (as the second paragraph) the following:

"I am transferring this file and my claim to Attorney Ray G. Brown, 430 S.W. Morrison Street, Portland, Oregon 97204, to represent me, because he has agreed to loan me money for

---

[1] Oregon Laws 1983, chapter 618, made substantial changes in the laws relating to the discipline of lawyers. However, that chapter provides that any proceeding pending on January 1, 1984, shall be completed as provided in the former statutes.

[2] We make this finding based upon Black's testimony before the Trial Board.

my personal needs and expenses to be repaid from the proceeds of the recovery in the above claim for damages."

On February 4, 1982, Brown filed a complaint with the clerk of the court for Anderson against the owner of the other vehicle involved in the accident.

Cancelled checks on Brown's office account show that he loaned Anderson these further sums on the following days:

|  |  |
| --- | --- |
| February 15, 1982 | $157.40 |
| March 27, 1982 | 50.00 |
| April 13, 1982 | 118.60 |

All of the loans were made for Anderson's personal living expenses.

On April 21, 1982, Anderson gave Brown $361 in full payment of all previous loans. This payment was made prior to the settlement of her case against the owner of the second vehicle.

On May 5, 1982, a grievance was filed by Black with the Oregon State Bar concerning Brown's above described conduct.

On May 17, 1982, Anderson met with Brown in his office concerning the charges that had been filed with the Bar. Anderson expressed anger about the wording of that portion of the receipt set out above. Brown prepared and Anderson signed the following affidavit:

"1.   I make this affidavit to clear up and to deny a statement in a receipt I gave Jarvis Black when I picked up my file in order to take the case to Ray G. Brown. Mr. Black handed me a paper telling me it was a receipt for the file and without reading it I signed it. Today I read it for the first time. The second paragraph of the statement is absolutely untrue.

"2.   I wanted Mr. Brown to handle my case because for about 25 years he has been my father's attorney, he has represented my mother in three cases and about three years ago he handled an item for me arising out of an automobile accident. At no time was there any agreement between me and

Mr. Brown that he would lend money to me for personal needs and expenses or for any other purpose."[3]

Anderson's affidavit was then forwarded to the Bar for the purpose of persuading it to drop its investigation.

On March 1, 1983, the Oregon State Bar filed its formal complaint against Brown. The complaint sets forth two separate causes which are summarized as follows:

(1)  In January, 1982, Brown undertook to represent Anderson[4] with respect to a claim for damages arising out of an automobile collision. Anderson signed a receipt for her previous attorney acknowledging that she was changing attorneys because Brown had agreed to advance her money for personal expenses. Brown on four different dates did advance money to Anderson for expenses other than those incurred due to litigation. Brown's conduct was unethical and in violation of DR 5-103(B).

(2)  After a complaint was made to the Oregon State Bar accusing Brown of advancing money to his client he obtained a false affidavit from the client, Anderson. Brown's conduct was unethical and in violation of DR 1-102(A)(4), (5) and (6), 7-102(A)(4) and (6)."

In answer to the first cause, Brown admitted that he had advanced the money to Anderson for expenses other than those incurred by the litigation. In answer to the second cause, Brown admitted that he obtained the affidavit from Anderson,

---

[3] Jarvis Black testified before the Trial Board:

"Q. [By Bar's Counsel] Did you hand her Exhibit A (Receipt dated January 29, 1982) for her (Anderson's) signature?

"A. Yes, I did.

"Q. Did she read exhibit A in your presence?

"A. I asked her to read it. She did.

"Q. Did she appear to take her time in reading the instrument?

"A. I don't know how fast or how slowly she reads, but I had the impression that she had read it completely because I asked her if what was in there was true and she said 'yes' and I said 'okay, would you date it and sign it' which she did in my presence.

"Q. Did she have any questions about the matter contained in there?

"A. None whatsoever."

[4] By the time the Oregon State Bar filed its complaint Anderson had changed her surname to Davis by reason of marriage. We shall continue to refer to her as Anderson to prevent confusion.

"but specifically denies that he knew the facts were false and further denies that the facts set forth in said affidavit are in fact false."

Brown further denied that the conduct in either cause was unethical.

The Disciplinary Rules relevant to this matter are as follows:

"DR 5-103   Avoiding Acquisition of Interest in Litigation.

"(A)   A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:

"(1)   Acquire a lien granted by law to secure his fee or expenses.

"(2)   Contract with a client for a reasonable contingent fee in a civil case.

"(B)   While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.

"DR 1-102   Misconduct.

"(A)   A lawyer shall not:

"* * * * *

"(4)   Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5)   Engage in conduct that is prejudicial to the administration of justice.

"(6)   Engage in any other conduct that adversely reflects on his fitness to practice law.

"DR 7-102   Representing a Client Within the Bounds of the Law.

"(A)   In his representation of a client, a lawyer shall not:

"* * * * *

"(4)   Knowingly use perjured testimony or false evidence.

"* * * * *

"(6)    Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

"(7)    Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

The Trial Board found Brown not guilty of both causes of complaint. The Disciplinary Review Board found Brown not guilty of the first cause, but on the second cause it found him guilty of violating DR 7-102(A)(4) and (7). It specifically found the Bar did not prove a violation of DR 1-102(A)(4),(5) or (6) by clear and convincing evidence. It did not mention DR 7-102 (A)(6).[5]

In the first cause, Brown is accused of violating DR 5-103(B). It is the Bar's position that a lawyer who makes advances to a client for personal living expenses acquires an interest in the subject matter of the litigation. The Bar in its brief in this court relies upon and quotes at length from the Oregon State Bar's Ethics Opinion No. 67 (Dated September 24, 1958). Although that opinion is advisory only and predates the adoption of the Code of Professional Responsibility on December 30, 1970, we may consider it. This court in *In re Brown,* 277 Or 731, 733, 561 P2d 1030 (1977), said:

"The sources of the present rules are the Oregon statutes, decisions of this Court, and opinions of the Committee on Legal Ethics. * * * The present provisions are merely a more precise statement of the original Canons, Rules and decisions of this court."

A portion of Ethics Opinion No. 67 relied upon by the Bar is as follows:

"The practice of advancing living expenses and other expenses not properly connected with the actual litigation is simply an advance of funds to be repaid from a prospective settlement or verdict. An attorney who makes such advances

---

[5] This could lead to speculation that the finding by the Disciplinary Review Board of guilty on DR 7-102(A)(7) was a typographical error and that it intended to find Brown guilty of violating DR 7-102(A)(6). The complaint did not plead DR 7-102(A)(7). On review to this court, Brown claims that he cannot be guilty of DR 7-102(A)(7) because of lack of notice. *In re Chambers,* 292 Or 670, 676, 642 P2d 286 (1982). This makes no difference in the result of this matter because we find Brown not guilty of violating any section of DR 7-102 for a different reason.

is thereupon acquiring an interest in the subject matter of the litigation.

"Such payments or advances have a tendency to encourage either the commencement or the continuance of legal proceedings. The acquisition of any interest in the subject matter of the litigation also results in a conflict of interests between the attorney and the client which could result in the attorney's considering his own interest in determining whether a proposed settlement should be accepted or rejected. Such possible conflict of interest must be avoided. It is clearly inconsistent with the attorney's duty of undivided fidelity to his client."[6]

It is Brown's position that he made the loans to Anderson but that they had no connection with her claim for personal injuries and property damages against the owner of the other vehicle. Anderson testified that the loans were to be repaid from the personal injury protection (PIP) payments from her insurance carrier.[7] Brown testified that the loans were to be repaid by Anderson from her PIP coverage or a "personal injury protection type of coverage" that she had with her employer. Anderson in fact repaid the loan on April 21, 1982, from a check that she received from Farmers Insurance Company's PIP coverage. The payment was made before the settlement of Anderson's case against the owner of the other vehicle and before the start of the Bar's investigation.

---

[6] Oregon State Bar Ethics Opinion No. 67 refers with approval to Canon 42 of the Canons of Professional Ethics of the American Bar Association and Opinion 288 by the Committee on Professional Ethics of the American Bar Association. It is interesting to note that the American Bar Association's version of DR 5-103(B) is identical to Oregon's, except that it contains a footnote which reads: "See ABA Canon 42; cf. ABA opinion 288 (1954)." Thus it appears that Oregon State Bar Ethics Opinion No. 67, American Bar Association's Canon 42 and Opinion 288 are the "legislative history" of Oregon's DR 5-103(B).

Canon 42 is as follows:

"EXPENSES OF LITIGATION

"A lawyer may not properly agree with a client that the lawyer shall pay or bear expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

The headnote to the American Bar Association's Opinion 288 is:

"An attorney may not advance living costs to an injured client or the members of his family while suit is pending but may advance court costs, witness fees, and other expenses resulting from the conduct of the litigation itself."

[7] ORS 743.800.

Thus, Brown contends that because the loans were to be repaid and in fact were repaid from Anderson's PIP coverage, he did not acquire an interest in the litigation— Anderson's case against the owner of the other vehicle to recover damages for personal injury and property damage.

We hold that under the facts of this case, Brown did acquire an interest in the litigation by advancing money to Anderson for her personal use. We note that Ethics Opinon No. 67, *supra,* speaks of "acquiring an interest in the subject matter of the litigation" and does not limit the prohibition to an interest in the final settlement or verdict in the case. The subject matter of the potential litigation in this case included all of the matters arising out of the collision between Anderson's vehicle and the other vehicle.

To prevail under Brown's theory of the case, he would have to admit that when he advanced the $361 to Anderson, he acquired an interest in her PIP coverage. Farmers Insurance Company carried Anderson's PIP coverage. When Brown accepted the file from Black, it included a statement which showed that Black had sent "letters to Farmers Insurance Company enclosing medical bills" and had telephone "calls to and from Farmers Insurance re forms for claim under PIP coverage for lost wages and medical charges."

Under some circumstances Farmers Insurance Company could be entitled to a lien against Anderson's cause of action against the owner of the second vehicle for the amounts paid to her under the PIP coverage. ORS 743.828. Under other circumstances, Farmers Insurance Company could be entitled by way of subrogation to "the proceeds of any settlement of judgment" that Anderson might recieve to reimburse it for the PIP payments. ORS 743.830. In either event, Brown would find the repayment of his loans to Anderson directly related to the settlement or judgment from the personal injury action against the driver of the second vehicle.

What would Brown do if Farmers Insurance Company for some unforeseen reason refused to pay Anderson the PIP coverage? Would he be required to withdraw and tell Anderson that he had acquired an interest in that coverage? Could he continue to represent Anderson on the liability claim? We think that these questions would result in hair-

splitting decisions. It would be impractical to allow the representation of a client on the subject matter of litigation to be divided in areas so that in some situations the lawyer could loan money to the client and in others he could not. Clients would not understand the fine distinctions that would result. To hold otherwise would violate the intent and spirit of DR 5-103.[8]

On the first cause, we find by clear and convincing evidence that Brown is guilty of violating DR 5-103(B). The fact that Anderson needed the money, the amounts involved were small and no one was hurt, are matters of mitigation in determining a proper sanction. *In re Otto W. Heider,* 217 Or 134, 159, 341 P2d 1107 (1959). *See In re Berlant,* 485 Pa 439, 328 A2d 471 (1974).

In the second cause Brown is accused of violating DR 1-102(A)(4),(5) and (6) and DR 7-102(A)(4) and (6).

First we will consider DR 7-102. That disciplinary rule simply does not fit this situation. For example, DR 7-102(A)(4) states: "In his representation of a client, a lawyer shall not knowingly use perjured testimony or false evidence." The phrase *"representation of a client"* is a condition precedent to the operative subdivisions of the rule. In other words, the lawyer cannot violate the rule unless he is representing a client. Brown obtained the affidavit from Anderson who was his client on a different issue. He was outside the scope of the attorney-client relationship when he dictated and asked Anderson to sign the affidavit. He procured the affidavit for

---

[8] South Carolina's DR 5-103 is identical to Oregon's.

In a South Carolina case, *Matter of Reaves,* 272 SC 213, 250 SE2d 329, (1978), a lawyer was charged with loaning money to his clients in violation of DR 5-103(B) and soliciting business in concert with a medical doctor. The lawyer admitted making the loans and in one instance the client used the funds to take a vacation. The court disbarred the lawyer and held:

"We are in agreement with the finding of the Panel, concurred in by the Board, that respondent violated Disciplinary Rule 5-103(B), and in so doing reject respondent's contention that it is a necessary element of such violation that the lawyer acquirė a proprietary interest in the cause of action itself as proscribed by 5-103(A), and that the type of loans made by respondent is clearly prohibited by its provisions." 272 SC at 214.

Because of the result we reach on the first cause of complaint, we do not reach the question decided by the South Carolina Supreme Court. It is not necessary for us to decide if 5-103(B) defines an offense independent of 5-103(A).

his own defense in a matter with the Oregon State Bar. If Brown had a client when he asked for, prepared and received the affidavit, it was himself.

Next, we consider the alleged violations of DR 1-102(A)(4), (5) and (6). Brown's defense of the second cause of complaint has been something of a mystery. The portion of Anderson's affidavit which gave rise to the second cause is:

"*** At no time was there any agreement between me and Mr. Brown that he would lend money to me for personal needs and expenses or for any other purpose."

Brown's formal answer to the Bar's complaint admits that he obtained the affidavit,

"[B]ut specifically denies that he knew the facts were false and further denies that the facts set forth in said affidavit are in fact false."

Brown's answer had previously admitted paragraph IV of the Bar's complaint:

"The Accused advanced sums of money to [Anderson] for expenses other than those incurred due to his client's litigation ***."

The Disciplinary Review Board found that Brown prepared a false affidavit for Anderson to sign. It weighed Brown's testimony before the Trial Board against him. It referred to five separate pages in the trial transcript where Brown testified to the effect that the sums advanced to Anderson were personal loans which she promised to repay.

Anderson testified before the Trial Board. Her testimony in part is as follows:

"Q. Mrs. Anderson, did Mr. Brown in fact loan you money?

"A. Not to my knowledge, no."

Thereafter the Bar had marked as exhibits the four checks showing that Brown had advanced the various sums to Anderson. The testimony resumed:

"Q. [By Bar counsel] Mrs. Anderson, I'm going to hand you what has been marked as Exhibit C [the check dated January 27, 1982 in the amount of $35.00] and it purports to be a check drawn on the account of Ray Brown with your name on it and on the backside of the check it's reflected there as well. It indicates your signature, is that your signature?

"A.  Yes, it is. But it wasn't a loan, it was only a loan until I got my check from Farmers Insurance, but he didn't just come out and give me no money. No.

Thereafter, the balance of the checks were identified and received into evidence.

Before the Trial Board Brown insisted that the affidavit was correct in spite of the admission in the pleadings and his testimony that the money advanced was for personal loans. There was no indication that Brown thought that the affidavit was ambiguous or that any part of it had been left out due to a scrivener's error.

Through the judicial admissions, exhibits and testimony, the Bar established that Brown loaned Anderson money for personal expenses. By this evidence together with the plain meaning of Anderson's affidavit, the Bar established before the Trial Board a *prima facie* case on the second cause of complaint. In other words, by testing the affidavit against the evidence it was clear that the affidavit was false. Apparently, Brown's defense or explanation before the Trial Board was that he loaned the money to Anderson but there was no agreement to do so.

Then eight months later, and after the Disciplinary Review Board had found Brown not guilty of the first cause and guilty of the second cause, he shifted his position and argued for the first time in his brief to this court:

"Admittedly, the second paragraph of Ms. Anderson's Affidavit is not artfully drafted and is capable of two interpretations. Had the Accused simply added the phrase 'that was to be paid out of the proceeds of my injury claim' to the last sentence of the second paragraph of Ms. Anderson's affidavit, the true meaning of the Affidavit would have been clear."

In other words, Brown is arguing that the last sentence of the affidavit should read:

"At no time was there any agreement between me and Mr. Brown that he would lend money to me for personal needs and expenses or any other purpose *that was to be paid out of the proceeds of my injury claim.*"

It must be remembered that the grievance about Brown's conduct was filed with the Oregon State Bar on May 5, 1982. Then, Anderson met with Brown in his office 12 days later on May 17, 1982. Because this was during the beginning

of the Bar's investigation, it is reasonable to infer that the Bar had not seen the four cancelled checks representing the loans to Anderson. The last loan from Brown to Anderson had been made on April 13, 1982, and the loans were paid in full on April 21, 1982. When Brown prepared the affidavit for Anderson's signature on May 17th, there was no way that he could have forgotten or overlooked the previous loans. The question of whether Brown had in fact made loans to Anderson was critical to the Bar's investigation. We find it is highly probable that the false affidavit was prepared and forwarded to the Bar to persuade it to drop its investigation. If the Bar in fact had believed the affidavit and taken it at face value, the investigation would have been at an end. On the other hand, if the affidavit had included the above quoted phrase which Brown now urges, the investigation would have continued and under our decision today Brown would have still been found guilty on the first cause.

We hold that the affidavit which Brown prepared for Anderson's signature on May 17, 1982, was not ambiguous and the suggested addition is an afterthought.

A lawyer who prepares and obtains the signature on a affidavit which he knows to be false is guilty of conduct involving dishonesty and that such conduct reflects on his fitness to practice law. Therefore, we find by clear and convincing evidence that Brown is guilty of DR 1-102(A)(4) and (6). We find him not guilty of DR 1-102(A)(5) because the Bar has not cited to us any authority to the effect that a bar proceeding comes within the meaning of "administration of justice" as set out in that rule. This question has not been argued or briefed.

Ray G. Brown is found guilty of violating DR 5-103(B) on the first cause and violating DR 1-102(A)(4) and (6) on the second cause. The violation of DR 5-103(B) under the facts and circumstances of this case, standing alone, would probably warrant only a public reprimand, but the violations of DR 1-102(A)(4) and (6) in the preparation of a false affidavit is extremely serious and demands a suspension from the practice of law. Ray G. Brown is suspended for a period of two years.[9] The Oregon State Bar shall recover costs.

---

[9] In similar cases our sanctions have been as follows: In the case of *In re M. E.*

**CARSON, J.,** dissenting.

The majority of the court finds Ray G. Brown to have engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, thus violating DR 1-102(A)(4) in having prepared and obtained Deonna Anderson's signature to a false affidavit. If a lawyer intentionally does such a thing, it certainly is a grave professional breach reflecting adversely on his or her fitness to practice law, as found by the court, DR 1-102(A)(6), and deserving of a severe disciplinary sanction.[1] The question is whether the proof that this accused intentionally did so prepare a false affidavit is "clear and convincing." *In re Galton,* 289 Or 565, 615 P2d 317 (1980).

In the affidavit at issue, Anderson purported to "clear up and deny" a statement in a receipt obtained from her by Mr. Jarvis Black to the effect that she was changing representation from Black to the accused "because he has agreed to loan me money for my personal needs and expenses to be repaid to him from the proceeds of the recovery in the above claim for damages." The affidavit stated that the quoted statement was "absolutely untrue." It continued by stating: "At no time was there any agreement between me and Mr. Brown that he would lend money to me for personal needs and expenses or for any other purpose."

The majority devotes much of its opinion to demonstrating that the accused in fact lent Anderson money for her personal needs and expenses and that the affidavit was textually false. But whether the accused lent Anderson money is not disputed. Nor is our reading and interpretation of the text of the affidavit. The issue is whether, when the accused had Anderson sign the affidavit, he regarded the affidavit as

---

*Reynolds,* 231 Or 159, 372 P2d 188 (1962), a lawyer who tried to persuade a county clerk to change a filing date to avoid the statute of limitations and gave a false affidavit in an attempt to have a case postponed was suspended for two years. In *In re Nathan Weinstein,* 227 Or 454, 362 P2d 762 (1961), a lawyer who was found guilty of wilfully attempting to procure a witness to give false testimony in a personal injury action was suspended for two years. In *In re Glover,* 156 Or 558, 68 P2d 766 (1937), a lawyer who gave false testimony in a will contest case was suspended for three years.

[1]*See also* ORS 162.075:

"(1) A person commits the crime of false swearing if he makes a false sworn statement, knowing it to be false.

"(2) False swearing is a Class A misdemeanor."

false and intended to use it in a manner constituting dishonesty, fraud, deceit, or misrepresentation as those terms are used in DR 1-102.

The Bar must prevail on this issue by clear and convincing evidence. The majority opinion proceeds to recite two possible "defenses." It says that "apparently" the accused's defense before the Trial Board was that he loaned the money without a prior agreement to do so. It then says that in this court, the accused's brief shifts to another explanation: that the affidavit was meant to deny that the accused had agreed to make loans against the proceeds of Anderson's injury claim, as recited in the receipt prepared by Jarvis Black.

The accused was represented by different counsel before the trial and disciplinary boards and before this court, and it is true that they offered alternative explanations of the affidavit. But the question is not one of alternative "defenses," as the majority would have it. The question is not what we consider as the more plausible reading of a document but whether the Bar proved what the accused meant to have Anderson swear to when he prepared the affidavit. That must be determined from the record, not from the arguments of counsel.

The accused's answer to the Bar's complaint did not deny obtaining the affidavit from Anderson and did not deny lending her money for personal expenses. It denied the falsity of the affidavit and the accused's knowledge of any falsity. Clearly the issue framed by the answer was not what the affidavit said but what the accused meant when he prepared it.

The Bar called the accused as a witness. The direct examination took him through the evidence of the loans and their repayment. The accused testified that his agreement with Mrs. Anderson was that she would repay them out of her monthly income, PIP coverage, and insurance coverage provided by her employer. Much of the testimony related primarily to the charges under DR 5-103. On the existence of an agreement, the accused was asked:

"Q. There is no question in your mind that you had an agreement with Deonna Anderson, that she would repay the loans?

"A. No question whatsoever."

The accused was later recalled for direct examination by his own counsel. He was asked:

"Q. Mr. Brown, that's the Affidavit that you prepared. My question to you is, do you now know or have you ever known that that Affidavit was false in any respect?

"A. No. I've never had any information to the effect that any part of it was false."

Counsel for the Bar asked no questions on this point. No further attempt was made to pursue why the accused believed that the affidavit was not false in any respect. He was never asked to explain what he meant. The record shows no inquiry and no direct testimony concerning the accused's understanding of the affidavit or his intentions either at the time the affidavit was prepared or at the time of the hearing. This is left entirely to inference.

From this record, the majority would infer that the accused induced his client to swear to a deliberately false affidavit with the intent to head off an investigation by the Bar into the facts asserted in the Jarvis Black receipt. Conceivably a lawyer might choose the much greater risk of submitting an outright and potentially criminal lie in the belief that it would end an investigation into a relatively less serious disciplinary charge. But the likelihood that an experienced lawyer with no known record of unethical behavior would do so is not so great as to make the inference compelling. Other inferences are possible. When the accused testified that he and his client had agreed as to the repayment of his loans but that nonetheless the affidavit was true, he must have had some explanation in mind. The affidavit read, in full:

"1. I make this affidavit to clear up and to deny a statement in a receipt I gave Jarvis Black when I picked up my file in order to take the case to Ray G. Brown. Mr. Black handed me a paper telling me it was a receipt for the file and without reading it I signed it. Today I read it for the first time. The second paragraph of the statement is absolutely untrue.

"2. I wanted Mr. Brown to handle my case because for about 25 years he has been my father's attorney, he has represented my mother in three cases and about three years ago he handled an item for me arising out of an automobile accident. At no time was there any agreement between me and Mr. Brown that he would lend money to me for personal needs and expenses or for any other purpose."

It was prepared specifically as a denial of the statement in the receipt on which the Bar's investigation rested, which was that the accused "agreed to loan me money for my personal needs and expenses to be repaid from the proceeds of the recovery in the above claim for damages." Perhaps at the hearing the accused meant that he intended the affidavit to deny that there was an agreement to lend the client money in return for transferring her case to his office, or to lend money to be repaid from or otherwise related to the proceeds of her claim, or that there was any agreement about loans at the time of the transfer. The accused was not asked, and we do not know.

These may not be convincing or even probable interpretations of the words of the affidavit, but to repeat, the present issue is not what meaning we would give those words. The question is whether the accused knew them to be false and intended to use them to deceive the Oregon State Bar. That was the Bar's burden to prove. But the Bar's examination of the accused at the hearing did not pursue the question of his understanding of the affidavit then or at the time he prepared it, though he continued to deny that the affidavit was false. The evidence that the accused knew the affidavit to be false must be clear and convincing before he can be found guilty of violating the disciplinary rules. From the record made at this hearing, the inference that he knew and intended the falsehood may be one plausible inference, but it is not clear and convincing. The trial board, which heard the testimony, did not draw that inference.

On this record, the court should not find the accused guilty of the second cause of the Bar's complaint.

Linde, J. and Roberts, J., join in this dissenting opinion.