Argued and submitted May 5, accused permanently disbarred October 5, 1982

In re: Complaint as to the Conduct of
VINCENT G. ROBESON,
*Accused.*

(OSB 79-22, SC 28197)
652 P2d 336

Jack H. Cairns, Portland, argued the cause for the Accused. Vincent G. Robeson, Lake Oswego, filed the brief.

Margaret H. Leek Leiberan, Portland, argued the cause for the Oregon State Bar. With her on the brief was Ron D. Bailey, Portland.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed an amended complaint against Vincent G. Robeson accusing him of unethical conduct in nine separate causes. All causes of action allege that Robeson was guilty of unethical conduct in that he violated the Discliplinary Rules of the Oregon State Bar and the Oregon Revised Statutes in his dealings with his client, Ruth Merwin, during 1976.

Robeson has been a member of the Oregon State Bar since 1964. An interoffice memo of a bank listed Merwin's age in 1976 as 60. Merwin was the beneficiary of a revocable trust which she had created naming a bank as trustee. Immediately prior to Merwin's business transactions with Robeson the principal balance in the trust was $1,300,000.[1] This case is unique in that Merwin did not make the complaint to the Oregon State Bar, refused to take part in the proceedings, and would not release Robeson from the attorney-client privilege.

The Trial Board found Robeson guilty of five of the causes and not guilty of the remaining four causes. It recommended that Robeson be indefinitely suspended from the practice of law.[2] The Disciplinary Review Board found Robeson guilty of eight of the nine causes of complaint and recommended that he be permanently disbarred. We conclude that Robeson should be permanently disbarred.

Around 1970 Harold E. Davis, James R. McKie and Robeson formed a corporation under the name of Davis, McKie & Robeson, Inc. The sole asset of the corporation was a tract of land with a potential for development

---

[1] Merwin retained the full power to dispose of the trust assets. In January 1976 Merwin, through the influence of Robeson, transferred the trust from one bank to another. On June 28, 1976 the second bank resigned as trustee and cited * * * as one of its reasons "due to the almost $900,000 in withdrawals this year, * * *."

[2] The Trial Board recommended that Robeson be suspended:

"* * * until he has made application for reinstatement and an affirmative showing, by evidence satisfactory to the Board of Governors and the Supreme Court, that he is, in all respects, again able and qualified, by good moral character and otherwise, to accept the obligations and faithfully perform the duties of an attorney in the State of Oregon, that he has the moral qualifications and general fitness required for admission to practice law in the State of Oregon, and that his resumption of the practice of law in the State of Oregon will be neither detrimental to the integrity and standing of the Bar or the administration of justice nor subversive to the public interest."

in Clackamas County.[3] Davis, McKie and Robeson owned the stock of the corporation in equal shares. The corporation borrowed a sum of money which was used to buy additional land and to pay for the engineering fees necessary for a zone change. The debt and property were refinanced with Rainier Credit Company. The promissory note became in default. A foreclosure suit was settled on September 8, 1975 by Davis, McKie & Robeson, Inc. deeding the land to Rainier Credit who in turn gave back to the grantor an option to repurchase the property within one year for the sum of $100,000 plus interest, costs, attorney fees, title report fees and escrow fees.

Robeson began representing Merwin as her attorney in late 1974 or early 1975. On January 20, 1976, Merwin gave Robeson a cashier's check payable to him in the amount of $150,000. According to Merwin this money was to be used to purchase stock for her in the National Automatic Sprinkler Co., an Oregon corporation.[4] Robeson had been the company's lawyer. An employee of a bank

---

[3] Davis and McKie were from the same small town in the Midwest. When Davis had a stroke in 1964 or 1965, he owned the original tract of land in question. Davis was declared incompetent and McKie was appointed the guardian. In 1968 McKie sought out Robeson to untangle Davis' affairs. Robeson advised (1) to have Davis declared competent, (2) to form a corporation, and (3) to apply for a zone change. Davis was declared competent on a doctor's affidavit and deeded the land to the corporation. Robeson's conduct in connection with Davis and McKie is not in question in these proceedings.

[4] Merwin testified to this effect in the Clackamas County Circuit Court in November of 1977 in a trial wherein A. R. Kauffman was plaintiff and Robeson and his wife were defendants. At that trial Merwin's lawyer explained that she was willing to waive the attorney-client privilege only to matters subject to that lawsuit and that she was not "waiving any privilege with respect to personal matters or involvements of Mr. Robeson outside the boundaries" of that particular lawsuit.

There are five separate letters or affidavits in the record signed or executed by Merwin or her lawyers after 1977 stating that she would not waive the attorney-client privilege. One of these documents is a letter in December 1979, from Merwin's lawyer to the lawyer representing the Oregon State Bar, and in part it said:

"Therefore, I must ask that you investigate or pursue nothing regarding my client's business or personal affairs as they may relate to Vincent Robeson, * * *, or any other attorney over which you have jurisdiction.

"My client has instructed me not to waive her attorney-client privileges; therefore, any prior waiver, if any, is rescinded, and you are specifically instructed not to discuss any matter with Ms. Merwin without first contacting me."

testified that Robeson used the $150,000 cashier's check to purchase four other cashier's checks payable to himself and that none of the funds were deposited in his client's trust account. Sometime between January 20, 1976 and February 3, 1976, Robeson contacted National Automatic Sprinkler to buy stock on behalf of Merwin. The offer was refused.

On February 3, 1976, Robeson wrote a letter to National Automatic Sprinkler Co. tendering on behalf of himself and his wife a cashier's check in the sum of $135,000 for the purchase of 55% of the corporation's stock. The letter in part said:

"This investment would act as my retirement policy, in 20 years, the time that I would be 62, the investment should provide adequate income for retirement."

No mention was made of Merwin in the letter. The offer was refused.

At the hearing before the Trial Board Robeson claimed that he borrowed $150,000 from Merwin. There are no documents in the record to show that it was a loan. There is no evidence of security, terms of repayment or interest rate. When Robeson was specifically asked if there were any written agreements defining his relationship with Merwin in connection with the $150,000 he claimed the attorney-client privilege.

On February 17, 1976, Robeson and his wife used $120,618.03 of the funds received from Merwin to purchase in their own names the 17 acres of development land in Clackamas County from the Rainier Credit Company. As the land was subject to the option given to Davis, McKie & Robeson, Inc. to repurchase until September 8, 1976, it was necessary for Robeson to deal with Davis and McKie who owned two-thirds of the corporation. On March 19, 1976 by written contract, Robeson agreed to buy all the corporate stock of Davis and McKie for the sum of $100,000. The sum of $10,000 was paid down upon the execution of the agreement with the balance of $90,000 to be paid on terms.

Although the deed is not a part of the record, it is apparent from other documents that Robeson had caused the title of the 17 acres to be transferred to NOR-AM-CO,

an Oregon corporation that had been incorporated on February 23, 1976. Robeson, his wife, and A. R. Kauffman (another business associate) were the sole stockholders of the corporation. The $90,000 balance due Davis and McKie became an obligation of the corporation.

On March 22, 1976, Robeson prepared a contract whereby NOR-AM-CO sold to Merwin and one Jerry W. Nicholson 240,000 square feet (5.5 acres) of the 17 acre tract of land for the sum of $336,000. Ten percent or the sum of $33,600 was the down payment. The contract provided:

> "NOR-AM-CO hereby acknowledges an off-set of $150,000.00 against said purchase price which shall be off-set at the time of the plat approval. This is payment in full of a debt assumed by NOR-AM-CO from VINCENT G. ROBESON due to RUTH MERWIN."

The balance of the purchase price ($152,400) was to be paid when the plat was approved by the City of Lake Oswego.

On April 25, 1976, while Robeson and his wife were on vacation in Hawaii with Merwin, he obtained a $50,000 loan from Merwin. The check for the loan was made payable to NOR-AM-CO, which in turn, on April 28, 1976, issued its check in the same amount to Pacific International Forest Products, Inc., a corporation in which Robeson had an interest. Robeson's reasons for the loan are vague.[5] At the hearing before the Trial Board he testified:

> "Well, again, items that gave rise to the loan would be, obviously, in my mind covered by the attorney client privilege. The fact is to solve the problems of Mrs. Merwin, a loan was offered, and I accepted it."

Under date of May 1, 1976, Robeson executed his personal promissory note to repay the loan in ten equal annual installments. Interest was to be paid at the rate of 10% per annum.

---

[5] A. R. Kauffman testified before the Trial Board to the effect that both he and Robeson had an interest in Pacific International Forest Products, Inc. (Kaufman had a 35. interest). A & M Hardwood, which was in the wholesale lumber business, had become a subsidiary of Pacific International and the $50,000 was needed as additional capital.

On July 20, 1976, Robeson, his wife, and Kauffman traded all of the outstanding stock of NOR-AM-CO to Merwin for 1,250 shares of U.S. Bancorp, 1,200 shares of Crown Zellerbach Corporation, and 722-2/3 (pre-split) shares of Caterpillar Tractor Company. The shares traded by Merwin had a fair market value of $146,408. Robeson prepared the agreement for the exchange of stock and by it Merwin acknowledged that NOR-AM-CO had an outstanding obligation to Davis and McKie in the amount of $90,000. Kauffman had been the owner of 25% of NOR-AM-CO's stock.[6]

Also on July 20, 1976, as a supplement to the stock exchange agreement, Robeson, his wife and Kauffman promised Merwin that they would use the stock received from her as collateral to obtain a loan to pay Robeson's note to her of May 1, 1976 in the amount of $50,000. This was in fact done. The note is in the record marked paid in full as of July 27, 1976. No interest was paid.

On October 12, 1976, Merwin signed a guarantee and pledge agreement whereby she pledged 1,246 shares of Standard Oil of California as collateral for a loan from General Electric Credit Corporation to Pacific International Forest Products. Subsequently the stock was liquidated for the sum of $54,955 when Pacific International defaulted on the loan. Robeson claimed that the consideration to Merwin for making the pledge was an undocumented promise by Pacific International to make her a loan. Robeson explained as follows:

"A (Robeson) * * * So, Pacific International Forest Products then loaned Mrs. Merwin some money.

"Q (Bar's attorney) How much?

"A It was to be more than what she got, it was kind of as an as-needed basis. My recollection is that she got around nine or ten thousand dollars.

" * * *

"Q What was her advantage in this transaction?

---

[6] Kauffman testified that Robeson and he decided to divest themselves of NOR-AM-CO and the 17 acres because they were busy with the affairs of Pacific International Forest Products, Inc. and did not have the time to devote to the development of the property. Also, it would have been necessary to obtain additional finances.

"A   She needed money.

"Q   Your testimony is that she didn't have money available elsewhere?

"A   Well, now, I know what the problems were. I feel that's a privileged area, and I wouldn't know what the problems were if I didn't. And it's one of the areas that she probably wouldn't want to divulge.

"   * * *

"Q   Now, assuming for whatever reason she didn't want to liquidate them, which obviously would be one way to get money, couldn't she have borrowed against those securities anywhere and limited her liability in the amount of the loan?

"A   No. But I can't tell you why.

"Q   She was free to pledge them to GECC?

"A   It's her stock. She could have sold it.

"Q   Right. And she could have used this collateral for a loan?

"A   No. I don't think anybody wants to know why. She could have made it and somebody have it in the bank in a commercial institution; does that help?"

James McKie testified, without objection, before the Trial Board that the 17 acres were later sold by Merwin to American Guaranty for the sum of $800,000. However, everybody did not live happily thereafter.[7]

On November 20, 1979, the Oregon State Bar filed a complaint in this court against Robeson. An amended complaint was filed on September 3, 1980. This matter was called to the attention of the Oregon State Bar by a letter from a securities examiner of the Corporation Commissioner's office.

The amended complaint alleged generally that at all material times Robeson was the attorney for Merwin and then set out nine separate causes. The charging part of each clause may be summarized as follows:

---

[7] In addition to the previously mentioned lawsuit by Kauffman against Robeson, a suit in equity based on unjust enrichment was filed in June, 1978, by Davis, McKie & Robeson, Inc. against NOR-AM-CO and Ruth C. Merwin.

*First Cause.* On January 20, 1976, Robeson by inducing Merwin to give him a cashier's check in the amount of $150,000 to purchase stock on her behalf in the Automatic Sprinkler Company and then using in excess of $100,000 of the money to repurchase 17 acres of land in which he previously held an interest failed to protect the interests of his client, Merwin, in the following particulars: (a) obtaining funds without a note or security, (b) commingling funds, (c) appropriating funds for personal use, (d) investing funds to redeem property lost in a prior personal investment, and (e) investing funds in a spectulative investment.

*Second Cause.* On March 23, 1970, Robeson by inducing Merwin to purchase a part of the 17 acres for $336,000 (of which $150,000 was an offset of his debt to Merwin) failed to protect the interests of his client in the following particulars: (a) allowing her to make a speculative investment, (b) no protection for the down payment in the event the plat was not approved, (c) release of Robeson's personal obligation to Merwin, (d) no interest on the $150,000 obligation, and (e) Robeson used Merwin's money to buy property and then sold a part of it to her at a profit.

*Third Cause.* On April 25, 1976, Robeson, by inducing Merwin to loan him $50,000 for investment in a hardwood lumber operation, failed to protect the interests of his client in the following particulars: (a) failing to contemporaneously execute a promissory note, (b) failing to give security, and (c) allowing a speculative investment.

*Fourth Cause.* On July 20, 1976, Robeson, by inducing Merwin to trade stock in U.S. Bancorp, Crown Zellerbach, and Caterpillar for all the stock of NOR-AM-CO, failed to protect the interests of his client in the following particulars: (a) Merwin was induced to make a speculative investment, (b) Merwin was induced to purchase property which Robeson had obtained with funds advanced by her—all to Robeson's personal profit, (c) release of Robeson's personal liability, (d) the agreement as drafted by Robeson contained no warranties or hold harmless clauses in favor of Merwin, and (e) the agreement contained no itemization of the debts of NOR-AM-CO or encumbrances against the property.

*Fifth cause.* On July 20, 1976, Robeson, by inducing Merwin to enter into an agreement whereby the $50,000 note previously executed by him was to be repaid to her by using the stock received by Robeson as collateral failed to

protect the interest of his client in the following particulars: (a) Merwin gave up her right to interest on the note, and (b) no time limit or security was provided.

*Sixth cause.* On October 12, 1976, Robeson, by inducing Merwin to pledge marketable securities as a collateral for a loan from General Electric Credit Corporation to Pacific International Forest Products Company, failed to protect the interests of his client in that it was a speculative investment in which she had no interest and for which she was given no consideration.

*Seventh cause.* Robeson, in connection with the purchase or sale of securities to or from Merwin, made untrue statements of material facts and engaged in acts, practices and courses of business which operated as a fraud or deceit upon Merwin in violation of ORS 59.135.

*Eighth cause.* Robeson, in the course of the business transactions set forth in the first seven causes of complaint, was acting as attorney for Merwin. In the course of such transactions Robeson's exercise of professional judgment was affected by his own financial, business, property or personal interests.

*Ninth cause.* Robeson's conduct and course of conduct alleged in the first eight causes, taken in the aggregate, were prejudicial to the honor and integrity of the practice of law in this state.

All of the first six causes of complaint contain additional allegations: (1) That Merwin was relying upon Robeson for legal and investment advice. Merwin was not a sophisticated investor and was dependent upon the professional judgment of Robeson for protection of her interests; (2) Robeson entered into a business relationship with Merwin without requiring or urging his client to procure independent legal advice; and, (3) Merwin did not knowingly or meaningfully consent to the transaction, nor did she receive a full disclosure of the material facts.

All of the first eight causes of complaint alleged that the conduct of Robeson was unethical and in violation of Disciplinary Rules (DR) 1-102(A)(1), (4), and (6), 5-101(A), 5-104(A) and ORS 9.480(4). The following causes alleged that Robeson had violated additional Disciplinary Rules: First and third causes — 9-102(A) and (B); fourth

cause — 9-102(B); sixth cause — 7-101(A); and, seventh cause — 1-102(A)(3).[8]

---

[8]

"DR 1-102 Misconduct.

"(A) A lawyer shall not:
"(1) Violate a Disciplinary Rule.
"* * * *
"* * * *

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
"* * * *

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

"DR 5-101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

"(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

"DR 5-104 Limiting Business Relations with a Client.

"(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

"ORS 9.480. * * * The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose it appears to the court that:

"* * * *

"* * * *

"* * * *

"(4) The member is guilty of wilful deceit or misconduct in the legal profession; * * *"

"DR 9-102 Preserving Identity of Funds and Property of a Client.

"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
"(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the

Robeson filed an answer which admitted that an attorney-client relationship existed between himself and Ruth C. Merwin and answered each of the nine causes of complaint in the following form:

"Accused respectfully declines to answer all of the other allegations contained in the ____ Cause of Complaint on the grounds that an Attorney-Client privilege and confidential relationship has been claimed by RUTH C. MERWIN, * * *."

Robeson also included four affirmative defenses in his answer: (1) that the Oregon State Bar was charged with the responsibility of protecting the client's rights and was estopped from investigating and pursuing the attorney-client relationship; (2) the Oregon State Bar should not be allowed to pursue the matter where the client objects; (3) the Oregon State Bar has no standing to pursue a complaint where the client has refused and continues to refuse to make a complaint or waive the privilege, and, (4) the accused believes that because of the attorney-client privilege he cannot answer allegations of the complaint and therefore requests that any matter not admitted be denied.

---

portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

"(B) A lawyer shall:
"(1) Promptly notify a client of the receipt of his funds, securities or other properties.
"(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

"DR 7-101 Representing a Client Zealously.

"(A) A lawyer shall not intentionally:
"(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102(B)."

"DR 1-102 Misconduct:

"(A) A lawyer shall not:
"(3) Engage in illegal conduct involving moral turpitude."

The trial committee found Robeson guilty of the first, second, fourth, sixth, and eighth causes of complaint and not guilty of the remaining four causes. The disciplinary review committee found Robeson guilty of all causes of complaint except the seventh.

■ Robeson's pro se brief in this court sets out 22 assignments of error. The assignments of error which warrant discussion fall into three general categories: (1) an alleged conflict of interest of two of the attorneys representing the Bar, (2) attorney-client privilege, and (3) sufficiency of the evidence. The oral argument in this court on behalf of Robeson concentrated on these categories.

The hearing before the Trial Board was held October 16 through October 18, 1980. At that hearing the Oregon State Bar was represented by three Portland lawyers.[9] From the testimony of Robert Magee, trust officer for a bank, it appeared that probably the Portland law firm with which two of the Bar's attorneys were associated had represented Merwin in connection with some business concerning a mortuary in LaGrande. This raised a potential conflict of interest problem.

On December 18, 1980, the Trial Board held a hearing to determine what should be done about the conflict of interest matter. From the record of that hearing it appears that the two Bar attorneys did in fact find one or more files that indicated their law firm had represented Merwin in 1976.

The third attorney for the Bar took the position that the other two Bar attorneys should not resign. He represented to the Trial Board:

"I think it would be inappropriate and unnecessary for counsel * * * to resign. There's nothing on the record to indicate their representation of Mrs. Merwin at one time in any way has any bearing on this case. The representation

---

[9] There were two lawyers from the same law firm representing the Oregon State Bar at the hearing before the Trial board on October 16-18, 1980 however, in some places the record speaks only of the senior lawyer and ignores the junior lawyer. It may be that the junior lawyer was not officially appointed and was merely helping the senior partner.

of Mrs. Merwin is, you know, one matter or two matters were entirely separate from the issues that are in this case. * * * Now, the evidence that was produced here was from other witnesses, it was from prior testimony of Mr. Robeson, Mrs. Merwin's testimony, came from public records. There is no indication that in the preparation of the case or in the presentation of it that there was any information other than any other person could obtain through other records or other testimony."

Robeson took the position that there was an appearance of impropriety:

"(MR. CAIRNS:) I've got some confusion to this extent: one, I think there is an appearance of impropriety and I think that's bad in Bar matters. I think particularly bad. * * * Now, if you ask me am I urging the Board to require him to resign, I would have to say no. * * * I'm willing to accept the fact that * * * he never saw the file before. I have no reason to doubt that nor that he knew anything about it."

On March 20, 1981 the Trial Board entered an order by which it "reluctantly" accepted the tendered resignation of the Bar attorney in question. On the same date the Trial Board denied Robeson's motion requesting the production of documents formerly in the law firm's files as to which Merwin had asserted an attorney-client privilege. The motion was denied on the ground that the Trial Board lacked power to command production of materials which were protected by the privilege.

Both parties cite the case of *In re J. Kelly Farris,* 229 Or 209, 367 P2d 387 (1961). Farris claimed error because one of the attorneys assigned by the Bar to prosecute the case represented Travelers Insurance Company who insured the automobile of one of the victims.

This court answered by saying it had read all of the testimony given before the trial committee and had found no indication of conduct upon the part of the lawyer representing the Bar "which invaded or could have prejudiced the rights of the accused." It added: "No attorney should be appointed as prosecutor who is counsel for a client interested in the disbarment case." 229 Or at 216-217.

Robeson has not cited us to any authority on the question of the appearance of impropriety. Canon 9 provides: "A lawyer should avoid even the appearance of impropriety."[10] Although the two attorneys were embarrassed there is no evidence that the "awkward situation" or "the appearance of impropriety" was caused by their intentional or negligent acts. When they were first appointed to represent the Bar the attorneys ran a "conflicts check" and the result was negative. The only possible explanation was that their law firm was in the process of a merger and the files may have been misplaced. As soon as the attorneys found out that their firm had represented Merwin they tendered their resignation.

Even if we were to find that there was an appearance of impropriety we would be at a loss to know what Robeson expects us to do. In response to questions by a member of the Trial Board Robeson's attorney answered:

"MR. BORGWARDT: (Member of the Trial Board) Let me ask you this, Mr. Cairns, if the Board were to agree with you and accept the resignation are you suggesting that we go back and reopen the hearing and start ab initio —

"MR. CAIRNS: Without limitation, I would say no.

"MR. BORGWARDT: All right. So, you are suggesting that what has been done remain?

"MR. CAIRNS: Yes."

■ We have read all the testimony and examined all the exhibits in this case and find no conduct on the part of the attorneys for the Bar which invaded or prejudiced the rights of Robeson. *In re J. Kelly Farris, supra.*

Robeson filed a preliminary motion with the Trial Board requesting that the Bar's complaint be dismissed on

---

[10]"DR 9-101 Avoiding Even the Appearance of Impropriety.

"(A) A lawyer shall not accept private employment in a matter upon the merits of which he has acted in a judicial capacity.

"(B) A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

"(C) A lawyer shall not state or imply that he is able to influence, improperly or upon irrelevant grounds any tribunal, legislative body, or public official."

*In re Ainsworth*, 289 Or 479, 614 P2d 1127 (1980), limits the general terms of Canon 9 to the three specific situations set out in DR 9-101(A), (B) and (C).

the ground that he could not defend himself because the attorney-client privilege required him to remain silent. His position was that he had a "Hobson's choice" of remaining silent and allowing a finding of unethical conduct for past acts or testifying in his defense and thereby committing a new act of unethical conduct. The Trial Board denied the motion and held that Robeson was free to testify as to attorney-client communications to the extent that the same were relevant to his defense of unethical conduct. The Trial Board at least in part based its ruling on ORS 9.750.[11]

DR 4-101(C)(4) in part provides:

"A lawyer may reveal: Confidences or secrets necessary * * * to defend himself * * * against an accusation of wrongful conduct."

When the complaint to the Oregon State Bar has been made by the client as to the conduct of the lawyer then there is a waiver of the privilege and it is simple to apply DR 4-101(C)(4). Here there is a different problem because a third party made the complaint. There are at least two federal cases which hold that DR 4-101(C)(4) applies to third party complaints.

In *Meyerhofer v. Empire Fire and Marine Insurance Co.*, 497 F2d 1190 (2 Cir) *cert den,* 419 US 998 (1974), the plaintiff who had purchased Empire stock claimed a securities law violation, based on the failure to disclose a finder's fee arrangement with Empire's law firm. Goldberg who had been an attorney with the law firm was named a party defendant. Goldberg attempted to exonerate himself by use of a pretrial affidavit. Empire claimed attorney-client privilege. The Circuit Court of Appeals held in favor of Goldberg:

---

[11] ORS 9.750 provides:

"Persons examining the files and records of the law practice of the affected attorney pursuant to ORS 9.005, 9.040, 9.050, 9.090, 9.180, 9.200, 9.210, 9.260, 9.270, 9.550, 9.560 and 9.705 to 9.755 shall observe the lawyer-client privilege and shall make disclosure only to the extent necessary to carry out the purposes of ORS 9.005, 9.040, 9.050, 9.090, 9.180, 9.200, 9.210, 9.260, 9.270, 9.550 and 9.705 to 9.755. Such disclosure is a disclosure which is reasonably necessary for the accomplishment of the purpose for which the affected attorney was consulted. The appointment of such custodian shall not affect the lawyer-client privilege which privilege shall apply to communications by or to the custodian to the same extent as it would have applied to communications by or to the affected attorney."

"Despite the breadth of paragraphs EC4-4 and DR4-101(B), DR 4-101(C) recognizes that a lawyer may reveal confidences or secrets necessary to defendant himself against 'an accusation of wrongful conduct.' This is exactly what Goldberg had to face when, in their original complaint, plaintiffs named him as a defendant who willfully violated securities laws." 497 F2d at 1194-1195.

In *Application of Friend,* 411 F Supp 776 (SD NY 1975) an attorney, Solomon H. Friend, applied to the court to turn over to the United States grand jury certain documents. The grand jury was investigating Friend and his client, Amrep Corporation. The client objected and claimed the attorney-client privilege. The District Judge held:

"The government and Mr. Friend contend that, pursuant to the Code of Professional Responsibility, Disciplinary Rule 4-101(C), Mr. Friend is entitled to turn over the documents to the Grand Jury. *See Meyerhofer v. Empire Fire and Marine Insurance Co.,* 497 F2d 1190 (2nd Cir. 1974). I agree." 411 F Supp 776 at 777.

*See also* McMonigle and Mallen, *The Attorney's Dilemma in Defending Third Party Lawsuits: Disclosure of the Client's Confidences or Personal Liability?* 14 Will. L. J. 355 (1978).

We hold the Trial Board's order in the context of this case was correct in allowing Robeson to testify as to the the attorney-client communications to defend himself. Robeson did not take a consistent position in his testimony before the Trial Board. He darted in and out of the privilege. When it was to his advantage to claim the privilege, he did so. When it was to his advantage to ignore the privilege, he did that.[12]

---

[12] Examples of Robeson claiming the privilege are shown in the previous quotes of his testimony in this opinion. An example of his ignoring the privilege is the following quote from his pro se brief in this court:

"During the same period of time, handled here separately so as not to detract from each transaction, [sic] between the time the Contract had been executed for the lots and the termination of Mr. ROBESON, Mrs. MERWIN who had been desirous of transferring her assets out of a revocable trust which she controlled through the Bank into other business interests had requested Mr. ROBESON to look for other good investments which she desired to keep secret from Mr. NICHOLSON her General Manager whom she was planning to marry. Mr. ROBESON suggested she may consider a wholesale lumber company and she decided she would put $50,000.00 into the Company and make available a pledge of additional securities to secure the buying and selling transactions conducted by the

In October 1980 when Robeson's hearing was held before the Trial Board, ORS 44.040(1)(b) was in effect:

"(1) There are particular relations in which it is the policy of the law to encourage confidence, and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases:

"* * * *

"(b) An attorney shall not, without the consent of the client, be examined as to any communication made by the client to the attorney, or the advice given by the attorney thereon, in the course of professional employment."

ORS 40.040 has been replaced by Rule 503 of the Evidence Code, effective the first day of January, 1982. Rule 503 (2)(a) and 4(c) provide:

"(2) A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a) Between the client or the client's representative and the client's lawyer or a representative of the lawyer;"

"* * * *

"(4) There is no privilege under this section:

"* * * *

"* * * *

---

Company. The business was set up and the Lumber Traders went to work and the Company commenced business. At this time the ROBESONS went on vacation to Hawaii and Mrs. MERWIN and Mr. NICHOLSON were to accompany them on the way over and were to be married in Hawaii, however, Mr. NICHOLSON stated he was unable to leave at the time and would follow in a few days. While in Hawaii word came that Mr. NICHOLSON had gone to Mexico with his Ex-Wife, this upset Mr. [sic] MERWIN considerably and she was concerd [sic] about Mr. NICHOLSON having found out about the lumber Company or that he would find out about it, and she wanted out of the business. In order to avoid the financial consequences and problems she had already incurred in starting the business she offered at that point of time to loan Mr. ROBESON the sum of $50,000.00 the amount it would need to operate if he would in fact take over the Lumber Compay. Wherein a loan was made to Mr. ROBESON with a ten year pay back. When Mrs. MERWIN terminated his services and purchased the real property as stated above she insisted on repayment of the $50,000.00 as part of that transaction, which was done and the Note paid and cancelled."

"(c) As to a communication relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer;"

In a brief filed with the Trial Board Robeson quoted DR 4-101 in full and discussed it generally, but he did not raise or argue the question of whether the specific provisions of DR 4-101(C)(4) were invalid in the face of the general provisions of ORS 44.040(1)(b). The brief filed with the Trial Board is incorporated into and made a part of Robeson's opening brief in this court.

In his reply brief in this court Robeson discusses the rule in question as follows:

"Disciplinary Rule (CR 4-101, [C], [4], which the Bar claims allows a lawyer to defend himself against an action for wrongfull [sic] conduct; the Bar has always contended that this rule means that he can not only defend himself, but, that he can be required to answer the questions by the Bar. If one looks further at the rule, it says that a lawyer *may reveal; not shall reveal.* Simply stating that a lawyer *may reveal* confidences or secrets necessary to establish or collect his fee; or to defend himself or employees or associates against accusations of wrongful conduct. Nowhere does it give a 'right' to the Bar to delve into it for their own purposes. Even for the defense of the lawyer, himself, if he looks into the issues further; the rule obviously presupposes that the client has placed the lawyer into this position by not having paid fees or by being the accuser of wrongful conduct. * * *" At pages 14-15. (Emphasis in original).

We have no argument with the proposition that the Oregon State Bar cannot require the attorney to reveal privileged information. The point is — Robeson cannot complain about the attorney-client privilege when he did not take advantage of DR 4-101(C)(4) to defend himself against the alleged wrongdoing.

Although on oral argument members of this court raised the question of whether the specific provisons of DR 4-101 were controlling because of the general provisions of ORS 44.040(1)(b), the question was not raised, briefed or argued by Robeson. Therefore, we find it unnecessary to decide the question.

Robeson's attorney on oral argument in this court said in effect that they had been "unable to get to the bottom of this case" because of the attorney-client privilege and that it was like being "engaged in a fist fight with one hand tied behind you."[13] It is pure speculation to presume that Merwin's testimony would have corroborated Robeson's testimony. It is just one of the facts of life that a party to litigation does not always have available all of the witnesses he or she would like.

If there had been no attorney-client privilege it would not necessarily follow that Merwin would have been available to testify or that her testimony would have been favorable to Robeson. She could have been out of the state or unavailable for medical reasons. She might have completely contradicted Robeson's testimony.

The Trial Board did not make specific findings of fact. The Disciplinary Review Board issued a comprehensive opinion which included many findings of fact. Robeson's challenge to specific parts of those findings or the interpretation to be placed upon certain parts of the evidence is really a "jury argument" to this court. We make our own independent review of the evidence. *In re Chambers,* 292 Or 670, 642 P2d 286 (1982); *In re Galton,* 289 Or 565, 578, 615 P2d 317 (1980).

The facts previously recited in this opinion differ only slightly from the facts as found by the Disciplinary Review Board. We agree with many of the conclusions of the Review Board.[14] Merwin was not sophisticated or adept in the management of her money. When Robeson first received the $150,000 cashier's check he treated it as Merwin's money as he tried to buy stock in National Automatic Sprinkler Co. on her behalf. Later Robeson treated it as his own money when he tendered $135,000 to the sprinkler company to buy stock for himself and his wife and then used approximately $130,000 of it to purchase the 17 acres.

---

[13] Both parties stipulated that Merwin was unavailable to testify and her testimony from the previous trial of *Kauffman v. Robeson* was received in evidence.

[14] For the most part these conclusions are determinations of mixed questions of law and fact.

Finally, Robeson, when he set up NOR-AM-CO considered the $150,000 as a loan from Merwin.

Robeson prepared all of the documents in connection with the transaction between himself and Merwin. Merwin testified at the Kauffman trial that Robeson never advised her to seek independent legal advice. We believe her. Merwin relied upon Robeson for legal and investment advice and was dependent upon his professional judgment for the protection of her interests. If a full disclosure had been made by Robeson to Merwin we infer she would not have consented to the various transactions.

The various transactions between Robeson and Merwin leading up to and including Merwin's purchase of the 17 acres could be called "Operation Bootstrap." Merwin gave Robeson a cashier's check in the sum of $150,000. Robeson used approximately $120,000 of the funds to buy out Rainier Credit's interest in the 17 acres and $10,000 as a down payment on Davis and McKie's interest in the same land. Robeson then incorporated NOR-AM-CO and transferred the title to the 17 acres to it subject to the $150,000 owed to Merwin and the $90,000 balance due Davis and McKie. Robeson then caused NOR-AM-CO to sell Merwin 5.5 acres for $336,000 — 10. down and a cancellation of the $150,000 debt due Merwin (leaving a balance due of $152,400). Finally, Robeson and his associates traded all of the stock of NOR-AM-CO to Merwin and received in exchange stock listed on the New York Exchange worth $146,408. In six months Robeson, by the use of Merwin's money, had bootstrapped his contingent one third interest in 17 acres of land into $199,389.97.[15] On January 20, 1976 when Robeson accepted the cashier's check from Merwin in

---

[15] This figure is computed as follows:

| | |
|---|---|
| $146,408.00 | value of stock received from Merwin |
| 33,600.00 | downpayment of 10% |
| 19,381.97 | unused portion of $150,000 |

$199,389.97

Robeson states in his brief in this court that the $33,600 was paid to NOR-AM-CO on March 22, 1976 and infers that when Merwin purchased that corporation on July 20, 1976 the money was still there or that the money had been used to improve the 17 acres. There is no documentary evidence to support this argument.

the amount of $150,000 the only "chips that he put into the game" was his one-third interest in Davis, McKie & Robeson, Inc. which in turn had an option to repurchase the 17 acres until September 8, 1976 for the sum of $100,000 plus. In other words, in a period of six months Robeson by the exclusive use of Merwin's money had parlayed his contingent interest in the land into the sum of $199,389.97 for the benefit of himself, his wife and Kauffman.[16]

■    We hold, as did the Trial Board and the Disciplinary Review Board, that Robeson is not guilty of the seventh cause of complaint.

■    From our independent review we find by clear and convincing evidence that Robeson is guilty of the first, second, third, fourth, fifth, sixth and eighth causes of complaint.

Because of the result we reach in this case it is not necessary to consider the ninth cause of complaint.

In each of the seven causes of complaint on which we have found Robeson guilty he violated DR 5-101 because he accepted employment when the exercise of his professional judgment on behalf of Merwin was affected by his own financial interests. In the same seven causes Robeson violated DR 5-104 because he entered into business transactions with Merwin when they had different interests and Merwin expected Robeson to exercise his professional judgment for her protection. Robeson did not make a

---

[16] Throughout this case Robeson has argued that Merwin sold the 17 acres for the sum of $800,000 and therefor made a large profit. There is no documentary evidence to show that Merwin made a profit. We know that by purchasing all the stock of NOR-AM CO she assumed the $90,000 debt owed to David and McKie. We do not know what other debts NOR-AM-CO may have owed — there was no save harmless clause in the stock exchange contract.

We do know that Merwin sold the 17 acres on credit. If she sold the property with a small down payment by this time she might have repossessed it and resold it for a loss.

Assuming for the sake of argument Merwin did sell the property for a profit that does not excuse Robeson's conduct. The fact that no one was injured by the attorney's conduct is of no significance when the rules of professional ethics are violated. In re Albright, 274 Or 815, 549 P2d 527 (1976); In re Otto W. Heider, 217 Or 134, 341 P2d 1107 (1959). We held in In re Burrows, 291 Or 135, 629 P2d 820 (1981), that the fact that a district attorney's ex parte contact with the judge appeared, by hindsight, to be favorable to the defendant was immaterial.

full disclosure to Merwin as to his business and financial interests.

■ ■ The first cause is the only cause of complaint which charges Robeson with the misappropriation of funds. On that cause Robeson violated DR 9-102(A) and (B) because he did not deposit the $150,000 cashier's check in a trust account and did not repay the funds on demand to Merwin. There is no direct evidence that Merwin demanded the repayment of the funds, but there is sufficient evidence in the record from which we infer an implied demand. On the sixth cause Robeson violated DR 7-101(A)(3) because the pledge of stock by Merwin was without consideration and she was injured when the stock was sold.

■ The violations of the disciplinary rules by Robeson were willful misconduct in the legal profession and therefor grounds for disbarment under ORS 9.480(4).

We agree with the Disciplinary Review Board that the evidence before the Trial Board "demonstrated a persistent pattern of conduct" by Robeson in which he employed the attorney-client relationship to use Merwin's "assets for his own personal advantage."

The finding of guilt on the first cause alone would warrant permanent disbarment. In *In re Pierson,* 280 Or 513, 518, 571 P2d 907 (1977), we stated:

"We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment."

The large majority of lawyers in Oregon who are permanently disbarred have been found guilty of conversion or misapprioriation of their client's funds.[17] However, *In re Otto W. Heider,* 217 Or 134, 341 P2d 1107 (1959) an attorney was permanently disbarred for a course of conduct that included entering into a business relationship with a client. Heider represented the executrix of the an estate for

---

[17] *See* cases collected in *In re O. H. Bengston,* 230 Or 369, 370 P2d 239 (1962). *Also see* the following additional cases where attorneys have been permanently disbarred for the misappropriation or conversion of funds: *In re Bach,* 273 Or 24, 539 P2d 1075 (1975); *In re Dugan,* 272 Or 708, 538 P2d 938 (1975); *In re Gordon W. Smith,* 241 Or 542, 407 P2d 643 (1965); *In re Orin B. Collier,* 240 Or 617, 403 P2d 380 (1965); *In re Harry W. Matthews,* 233 Or 172, 377 P2d 160 (1962).

a period of 28 years and during that period of time he sold mortgages to the estate. He personally guaranteed the balance of principal and interest due except for one to three percent. He then collected the debt and paid the funds to the executrix except for the interest differential. The executrix understood that the difference kept by Heider was in payment for his personal guarantee. Part of what we said in that case is appropriate here:

> "This practice persisted for many years, the accused, in effect, employing the estate as a capital asset in the promotion of his own private business. * * *" 217 Or at 138.

> "He admittedly profited from personal dealing with his client while maintaining the semblance of a professional relationship. He utilized his legal representation of the estate to promote his personal interests. The attorney-client relationship was subordinated to the business and financial aspects of his livelihood. He has retained the profits so realized. * * * The fact that the executrix and heirs make no complaint is of little consequence in the evaluation of this practice in its aspects to legal ethics." 217 Or at 138-139,

> *"Law is not a business. It is a learned profession.* * * * Further, the fact that no one was injured by his conduct is fortuitous only and of no significance so far as this hearing is concerned." 217 Or at 159. (Emphasis in original).

We order that Vincent G. Robeson be permanently disbarred. The Oregon State Bar is awarded costs.