The PEOPLE of the State of Colorado, Complainant,

v.

James William ROBNETT, Attorney–Respondent.

No. 92SA488.

Supreme Court of Colorado, En Banc.

Oct. 4, 1993.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Asst. Disciplinary Counsel, Denver, for complainant.

James William Robnett, pro se.

PER CURIAM.

In this attorney disciplinary proceeding a hearing board found that the respondent,[1] James William Robnett, converted trust funds belonging to a client; engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation; failed to maintain complete records and to render appropriate accountings of funds in his possession belonging to a client; and failed to pay or deliver funds belonging to and requested by a client. Based on those findings, the hearing board recommended that the respondent be disbarred. A hearing panel of the Committee approved the hearing board's findings and also recommended disbarment as a sanction. The respondent has filed exceptions to the hearing panel's recommendations. We adopt the hearing panel's recommendation and order that the respondent be disbarred and that he pay the costs of the proceeding.

I

At the conclusion of an evidentiary hearing during which the respondent testified, the hearing board found that the following facts were established by clear and convincing evidence.

On April 5, 1978, Ruth N. Wynn, respondent's mother-in-law and client, executed a revocable trust agreement (the "Wynn Trust") prepared by the respondent. Wynn was the settlor and the respondent was named the trustee. Pursuant to the terms of trust, Wynn delivered $42,301.76 to the respondent as the corpus or principal

---

1. The respondent was admitted to the bar of this court on May 17, 1977, is registered as an attorney upon this court's official records, and is subject to the jurisdiction of this court and its grievance committee in these proceedings. C.R.C.P. 241.1(b).

of the trust. The agreement directed the respondent to invest the principal and pay the net income derived therefrom, together with payments from the principal if necessary, to Wynn or, upon her death, to Wynn's beneficiaries.

In June of 1978, the respondent pooled a substantial portion of the corpus of the Wynn Trust with part of the corpus of the Fisher Trust, another trust for which he served as trustee.[2] The respondent then purchased an eight-unit apartment building in Aurora, Colorado, with the assets of the two trusts. By letter dated September 17, 1979, the respondent reported to Wynn that he had disbursed $44,543.61 of the corpus of the Wynn Trust as follows: $23,217.35 to acquire a share in the apartment building; $3,592.50 for miscellaneous items; and $10,000 and $6,000, respectively, to purchase a Western Federal Savings money market certificate and a Century Bank certificate of deposit. The respondent reported that $100.36 of the corpus remained.

It is unclear whether the respondent actually purchased the money market certificate or the certificate of deposit. The respondent offered no documentary proof of those two expenditures to the hearing board.[3] The respondent testified that he used those funds for repairs and unanticipated bills. These expenditures were made without Wynn's knowledge or permission.

In March 1980, the respondent sold the apartment building under terms that produced a promissory note from the buyers in the amount of $108,250. In November 1984, the respondent sold the note back to the same buyers for $50,425.04. By letter dated August 5, 1987, he reported to Wynn that the Wynn Trust's "interest in that amount was equal to $25,212.50." Moreover, the respondent advised Wynn that interest of $3,862.18 had accumulated, and that, after taking into account various expenditures,[4] the "current balance" of the Wynn Trust was $26,078.99.

As the respondent admitted at the hearing, his August 5, 1987, letter was not true. On that date the corpus of the Wynn Trust equalled only $2,000 to $4,000. The respondent testified at the hearing that he chose not to tell Wynn the true status of the trust because he did not want her to believe that she did not have any money.[5]

On March 24, 1989, the respondent sent to Wynn a letter stating that the trust balance as of December 31, 1988, was $26,556.89 and that taxable income of $592.63 had been earned in 1988. Wynn paid income taxes for 1988 on the basis of this report. The letter also stated that the trust balance was being "held in Certificate of Deposit Account No. E–803215, on Deposit at Central Bank." Shortly thereafter Betty Robnett (Robnett), Wynn's daughter and the respondent's then wife, discovered that no such certificate of deposit for the benefit of the Wynn Trust existed and confronted the respondent. Subsequently, a new trust agreement was drafted. The respondent did not inform Wynn that the assets of the Wynn Trust had been depleted until November 10, 1989. Furthermore, while a certificate of deposit with the account number given by the respondent did exist at the Central Bank, the account balance was $10,000 and was owned by an individual unknown to Wynn.

---

**2.** Some of the facts of this case were previously related in *People v. Robnett,* 737 P.2d 1389 (Colo.1987), in which the respondent received a public censure as a result of his professional misconduct while serving as trustee to the Fisher Trust.

**3.** The request for investigation in this proceeding was filed on January 16, 1991. On January 17, 1991, the chief investigative counsel of the Office of Disciplinary Counsel sent the respondent a copy of the request for investigation and asked for a response to the allegations. The respondent has indicated that his files relating to the Wynn Trust were inadvertently shredded on January 25, 1991.

**4.** One of these expenditures apparently was a television set that the respondent gave Wynn for her birthday.

**5.** The hearing board concluded that the respondent's testimony on this point was "incredible" and "unbelievable," and that the respondent's presentation of such testimony to the board was an aggravating factor in its analysis of discipline. *See People v. Wechsler,* 854 P.2d 217, 222–23 (Colo.1993).

At the hearing the respondent initially admitted that the letter of March 24, 1989, was not true and conceded that in March of 1989 no assets remained in the Wynn Trust. Later, in response to specific questions concerning the truth or falsity of the statements in the letter, the respondent refused to answer on Fifth Amendment grounds.

■ In *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), the Supreme Court held that the Fifth Amendment privilege against self-incrimination afforded protection to an accused lawyer in a disciplinary proceeding. *Spevack* held that a lawyer was deprived of his rights under the Fifth Amendment when he was disbarred solely because of his refusal to testify in a judicial investigation into his alleged improper solicitation of clients. 385 U.S. at 514. Our rules recognize the right of an attorney to assert his privilege against self-incrimination in the context of a disciplinary proceeding. *See* C.R.C.P. 241.6(7) (although failure to respond to a request of the grievance committee without good cause constitutes a ground for discipline, good cause includes an assertion that a response would violate the attorney's constitutional privilege against self-incrimination).

*Spevack* did not specifically hold, however, that attorney disciplinary proceedings were criminal in nature for purposes of the Fifth Amendment privilege against self-incrimination. Accordingly, most courts and commentators after *Spevack* have tended to read the decision narrowly, concluding that disciplinary proceedings are not themselves criminal in nature for purposes of the privilege, and have "limit[ed] the scope of the privilege in disciplinary proceedings to only those disclosures that could be used in a criminal prosecution, or that could lead to other evidence that might be so used." II ABA/BNA *Lawyers' Manual on Professional Conduct* at 101:2402 (1984); *see generally* Andrea G. Nadel, Annotation, *Extent and Determination of Attorney's Right or Privilege Against Self–Incrimination in Disbarment or Other Disciplin-* ary Proceedings—Post–Spevack Cases, 30 A.L.R.4th 243 (1984 & Supp.1992).

Thus, in *State v. Postorino*, 53 Wis.2d 412, 193 N.W.2d 1 (1972), the court held that a lawyer disciplinary proceeding is civil in nature and not a criminal proceeding for purposes of the Fifth Amendment privilege against self-incrimination. Hence, a court is not foreclosed from drawing a negative inference from the lawyer's invocation of the Fifth Amendment on issues involving grounds for discipline. *Id.* 194 N.W.2d at 3. *Accord In re Disciplinary Proceedings Against Schalow*, 131 Wis.2d 1, 388 N.W.2d 176, 182 (1986); *but cf. In re Silverberg*, 459 Pa. 107, 327 A.2d 106, 111 (1974) (an accused attorney's constitutional right against self-incrimination was violated when the attorney's prior claim of the privilege was introduced to impeach his credibility). *Cf. In re Ruffalo*, 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (1968) (a bar disciplinary proceeding is quasi-criminal for purposes of the due process right to fair notice of the charge).

We need not resolve the question of whether the fact finder in an attorney disciplinary proceeding may draw a negative inference from an attorney-respondent's invocation of the Fifth Amendment privilege against self-incrimination, however, because there is no indication that the hearing board below drew any such inference. *Cf. Baxter v. Palmigiano*, 425 U.S. 308, 319–20, 96 S.Ct. 1551, 1558–59, 47 L.Ed.2d 810 (1976) (permitting an adverse inference to be drawn from an inmate's silence at the inmate's disciplinary proceedings did not on its face violate the Fifth Amendment privilege against self-incrimination since such disciplinary proceedings are not criminal proceedings); *Chaffin, Inc. v. Wallain*, 689 P.2d 684, 688 (Colo.App.1984) (Fifth Amendment does not preclude an adverse inference to be drawn where the privilege is claimed by a party to a civil cause); *Asplin v. Mueller*, 687 P.2d 1329, 1332 (Colo.App.1984) (the Fifth Amendment does not prohibit adverse inferences from being drawn against parties to civil actions when they refuse to testify with respect to probative evidence introduced against them). It

is noteworthy, however, that the respondent testified voluntarily here, and asserted his Fifth Amendment privilege only in response to questions concerning his handling of the Wynn Trust. In *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), the Court held that where the defendant in a denaturalization hearing, a civil proceeding, voluntarily took the stand and testified on her own behalf, she waived the right to invoke on cross-examination her privilege against self-incrimination regarding matters made relevant by her direct examination. *Id.* at 155–56, 78 S.Ct. at 626–27. The rule with respect to waiver is stricter in a criminal proceeding. "[T]he accused [in a criminal case], as to all facts whatever (except those which merely impeach his credit and therefore are not directly related to the charge in issue), has signified his waiver by the initial act of taking the stand." 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2276 at 459–60 (John T. McNaughton rev. ed. 1961).

The respondent testified at the hearing that, contrary to his August 5, 1987, written report to Wynn, the sale of the note did not generate $50,425.04. The respondent also testified that he and Robnett borrowed about $5,000 from the trust, with Wynn's permission, to pay personal debts. The respondent provided no note, security agreement, or other writing memorializing the loan, however. Wynn recounted specific expenditures from the trust of which she was aware, stated that she knew of no specific disbursements from the trust except those mentioned in the August 5, 1987, letter, and denied discussing financial difficulties of the respondent and Robnett with them. Based on the foregoing, the hearing board concluded that the respondent used the $5,000 for his own purposes, as he conceded, but without Wynn's permission, and therefore converted the funds.

In early November of 1989, Wynn executed a new "Trust Agreement" which by its terms revoked in part the Wynn Trust. The new agreement referred to the nonexistent certificate of deposit at Central Bank and purported to grant the respondent authority to use the certificate "to pay for things [Wynn] may need." Although it is not clear who prepared the new agreement, the respondent signed it as a witness.

Shortly after the new trust agreement was executed, the respondent informed Wynn about the losses and investments, that the trust had no assets, and that he would pay her what he owed her when he could. Wynn testified at the hearing that she knew the Wynn Trust had no assets but that she believed she had more than $26,000 in a certificate of deposit at Central Bank, which funds the respondent or the bank had taken. The board determined that as of November 10, 1989, or shortly thereafter, Wynn knew that no certificate of deposit existed and that the respondent had depleted the corpus of the Wynn Trust, but she did not know what expenditures had been made with the bulk of her money.

On March 2, 1991, Wynn, with the help of an accountant, wrote to the respondent referring to the certificate of deposit and demanding payment of the balance allegedly held for her in the certificate. She also asked for a detailed accounting of all trust income and expenditures for the years 1978 through 1989. The respondent did not reply to Wynn's letter. He testified at the hearing that because the Wynn Trust terminated in November of 1989, and because Wynn knew that the trust had no assets at that time, he had no duty to render any accounting. Contrary to his promise to pay Wynn what she had lost while he served as trustee, the respondent had not paid Wynn any sums as of the date of the hearing herein.

II

The hearing board concluded that the respondent's conduct while serving as trustee of the Wynn Trust and subsequent to the execution of the new "Trust Agreement" in November of 1989 violated the Code of Professional Responsibility. The board found that several of the respondent's written accountings to Wynn with respect to the income, expenses, and balance of the trust were intentionally false, contrary to DR 1–102(A)(4) (a lawyer shall

not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). The board also concluded that the respondent's conversion of approximately $5,000 of the trust also violated DR 1–102(A)(4); that his failure to render appropriate accountings to Wynn regarding her funds violated DR 9–102(B)(3) (failure to maintain complete records of client property in the possession of the lawyer and to render appropriate accounts to the client regarding the property); and that his failure to pay or deliver the funds of the Wynn Trust to Wynn, as requested, or the $5,000 of trust funds he applied to personal debts violated DR 9–102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive).

The respondent has filed an exception to the findings and conclusions of the hearing board. He first asserts that Wynn's testimony was self-contradictory, and cannot be considered truthful or, alternatively that she was incompetent. We disagree.

The standard of review is well-settled. "When approved by the hearing panel, the board's factual findings are binding on this court unless, after considering the record as a whole, the findings are unsupported by substantial evidence. *People v. Garnett*, 725 P.2d 1149, 1152 (Colo. 1986)." *People v. Bennett*, 810 P.2d 661, 665 (Colo.1991). When, as here, it acts as fact-finder, the hearing board has the duty to assess the credibility of the evidence before it, controverted and uncontroverted. *People v. Distel*, 759 P.2d 654, 662 (Colo. 1988). "In determining whether the board's findings are supported by substantial evidence, it is not within the province of this court to measure the weight of the evidence or to resolve the credibility of witnesses." *Id.* The alleged discrepancies in Wynn's testimony are relatively minor. Considering the record as a whole, we will not overturn the board's conclusions with respect to Wynn's credibility and the respondent's incredibility.·

The respondent next contends that because his testimony respecting his personal use of trust funds was never rebutted the board's determination that he converted those funds cannot be adopted. We disagree. "Knowing and intentional conversion [of client funds] may be established by various types of evidence." *People v. Wechsler*, 854 P.2d 217, 220 (Colo. 1993). In *Wechsler*, we noted that the board's finding that portions of the respondent's testimony were incredible, coupled with the failure of the respondent to deliver client funds until after the filing of a request for investigation, could support a determination that the respondent had converted client funds. *Id.* at 221. In this case, the respondent himself has testified that he used at least $5,000 of trust money for his personal use. Although he testified that Wynn orally approved or permitted a "loan" to the respondent, no documentary evidence was presented to corroborate such testimony, and the $5,000 was not repaid. Under these circumstances, the hearing board was not bound to believe the respondent's testimony. We conclude that the record supports the hearing board's conclusion that the respondent converted $5,000 of his client's funds. *Cf. Wechsler*, 854 P.2d at 221.

We also conclude, contrary to the respondent's contention, that the record contains sufficient evidence to support the board's conclusion that the respondent did not provide appropriate accountings, reports, and documentation to Wynn and failed to make full disclosure regarding the certificate of deposit. The hearing board stated that "the record reflects that nearly every time [the respondent] put pen to paper to account for the income and expenses of the Wynn Trust he lied." The evidence supports this finding.

Finally, we reject the respondent's argument that the modification or revocation of the Wynn Trust in November 1989 "extinguished" his duties to Wynn. As a fiduciary of trust funds, a trustee must keep the beneficiaries of a trust reasonably informed of the trust and its administration. § 15–16–303(1), 6B C.R.S. (1987). In addition, "[u]pon reasonable re-

quest, the trustee shall provide the beneficiary ... with relevant information about the assets of the trust and the particulars relating to the administration." § 15–16–303(3). Further, "[u]pon reasonable request, a beneficiary is entitled to a statement of the accounts of the trust annually *and on termination of the trust or change of the trustee.*" § 15–16–303(4) (emphasis added).

As the statement of facts indicates, the record contains ample evidence to support the board's conclusion that the respondent did not properly account to Wynn for the income and expenses of the Wynn Trust.[6]

### III

■■■ In the absence of significant mitigating factors, disbarment is the appropriate sanction for a lawyer who converts client funds and otherwise engages in deception of the client. *People v. Kearns,* 843 P.2d 1, 5 (Colo.1992); American Bar Association's *Standards for Imposing Lawyer Sanctions* 4.11 (1986) (ABA *Standards*) (absent aggravating or mitigating circumstances, disbarment generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client). Further, "[d]isbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client." *Id.* at 4.61.

■■■ The record in this case discloses numerous aggravating factors. The respondent was previously publicly censured for mishandling trust funds in a related case. *See People v. Robnett,* 737 P.2d 1389 (Colo.1987); ABA *Standards* 9.22(a). It is especially significant that almost all of the respondent's misconduct in this case occurred after the initiation of the earlier grievance proceeding. As the hearing board found, the respondent acted with a dishonest and selfish motive, *id.* at 9.22(b);

engaged in a pattern of misconduct, *id.* at 9.22(c); and committed multiple offenses, *id.* at 9.22(d). The hearing board also found that the respondent's testimony at the hearing was incredible, *id.* at 9.22(f);[7] that he has refused to acknowledge the wrongful nature of his misconduct, *id.* at 9.22(g); that Wynn was a vulnerable victim, *id.* at 9.22(h); that the respondent has substantial experience in the practice of law, *id.* at 9.22(i); and that he has been indifferent to making restitution, *id.* at 9.22(j). These findings are supported by the record.

The hearing board found no factors in mitigation, and concluded that the respondent's hostility to the disciplinary process precluded a finding that he had a cooperative attitude to the proceedings, a factor in mitigation. *See id.* at 9.22(e).

The respondent filed an exception to the hearing board's finding that he was hostile to the disciplinary process on the basis of his assertion of the attorney-client privilege in refusing to respond to the request for investigation. The respondent contends he was forced to assert the privilege because the charge of misconduct was not brought by Wynn, but by Wynn's granddaughter.

As relevant to these proceedings, DR 4–101(B)(1) provided that, except when permitted under DR 4–101(C), a lawyer shall not knowingly reveal a confidence or secret of the lawyer's client. However, DR 4–101(C)(4) permitted a lawyer to reveal "[c]onfidences or secrets necessary to establish or collect his fee *or to defend himself against an accusation of wrongful conduct*" (emphasis added). Some courts have indicated that this "self-defense" exception to the attorney-client privilege applies even when the accusation of wrongful conduct comes from a third person and not from the client. *See Meyerhofer v. Empire Fire & Marine Ins. Co.,* 497 F.2d 1190, 1194–95 (2d Cir.1974) (under DR 4–101(C)(4), lawyer who represented issuer of securities and who was named as a defen-

---

6. The respondent also contends that he was required to conduct his direct examination of Wynn out of order. However, he has not suggested how this alleged procedural irregularity

subjected him to any prejudice or otherwise affected his substantial rights. *See* C.R.C.P. 62.

7. *See* n. 5 *supra.*

dant in class action brought by purchasers of securities who claimed that prospectus contained misrepresentations had right to make appropriate disclosures of client confidences or secrets to defend himself or herself), *cert. denied*, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974); *First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.*, 110 F.R.D. 557, 562–66 (S.D.N.Y. 1986) (an attorney may disclose privileged information if necessary to defend himself or herself against pending civil or criminal charges even if the allegations are brought by third person); *In re Conduct of Robeson*, 293 Or. 610, 652 P.2d 336, 344–47 (Or.1982) (suggesting that the "self-defense" exception of DR 4–101(C)(4) applies in disciplinary proceedings when the complaint is brought by a third person).

 Colorado Rule of Professional Conduct (R.P.C.) 1.6(c), effective January 1, 1993, provides: "A lawyer may reveal such information [relating to the representation of a client] to the extent the lawyer reasonably believes necessary ... to respond to allegations in any proceeding concerning the lawyer's representation of the client." By its terms, the rule is not restricted to proceedings initiated by allegations from the client.

In any event, the board found that the respondent's conduct throughout the proceedings, rather than his failure to respond to the request for investigation, precluded a finding of cooperation. This determination is supported by the record and we will not overturn it. We also reject the respondent's apparent suggestion that the board somehow penalized him for asserting his privilege against self-incrimination during the proceedings. *See* n. 6 *supra*.

The respondent's misconduct was serious and repeated, and injured his client. In the absence of any factors in mitigation, we agree with the hearing panel's recommendation that disbarment is the appropriate sanction in this case.

## IV

Accordingly, it is hereby ordered that James William Robnett be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective thirty days from the date of this opinion. It is further ordered that the respondent pay the costs of these proceedings, in the amount of $958.91, within thirty days of the date of this opinion to the Supreme Court Grievance Committee, 500–S Dominion Plaza, 600–17th Street, Denver, Colorado 80202–5435.