**The PEOPLE of the State of Colorado, Complainant,**

v.

**Leo WOTAN, Jr., Attorney–Respondent.**

No. 96SA333.

Supreme Court of Colorado, En Banc.

Sept. 15, 1997.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Assistant Disciplinary Counsel, Denver, for Complainant.

Leo Wotan, Jr., Loveland, Pro Se.

PER CURIAM.

In this lawyer discipline proceeding, a hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that the respondent be suspended from the practice of law for ninety days. The respondent has filed exceptions to the panel's action. The complainant has excepted to the recom-

mended discipline as too lenient. After considering the seriousness of the misconduct in this case, we have concluded that a suspension for one year and one day is appropriate.

## I

The respondent has been licensed to practice law in this state since 1978. The complaint filed against the respondent contained five counts. The hearing board listened to the testimony of the complainant's and the respondent's witnesses, including the respondent himself. After considering the evidence admitted in this very contested proceeding, the hearing board made the following findings by clear and convincing evidence.

### A. The Wal–Mart Matter

In July 1992, the respondent was hired by a client to file a wrongful termination suit and other claims against the client's former employer, Wal–Mart Stores, Inc. The respondent filed a claim for unemployment benefits for the client that same month. In August 1992, the respondent sent a letter to John Bell, Wal–Mart's personnel director, concerning the circumstances of his client's termination. On August 27, 1992, Wal–Mart's corporate counsel, Lester C. Nail, wrote to the respondent requesting that any further communications involving the client's case be directed to him rather than any Wal–Mart manager.

A hearing on unemployment benefits was held on September 16, 1992. Wal–Mart was represented by J. Mark Baird of the law firm of Sherman & Howard, L.L.C. Baird told the respondent at the hearing that his law firm would be representing Wal–Mart in any action concerning the respondent's client involving unemployment compensation or allegations of discrimination. The day of the hearing the respondent filed a discrimination complaint with the Colorado Civil Rights Commission, and sent a copy of the complaint to Baird.

Following the September 16 hearing, however, the respondent called Bell, Wal–Mart's personnel director, and spoke with him regarding his client's case. On October 5, 1992, the respondent wrote to Bell and suggested a settlement proposal. Another lawyer from Sherman & Howard, W.V. Siebert, wrote to the respondent on October 13, indicating that he had received the respondent's correspondence to Bell. He reiterated Baird's previous notification that Sherman & Howard represented Wal–Mart with respect to the respondent's client's claims and reminded him not to communicate with any current or former supervisory or managerial Wal–Mart employees regarding those claims. The respondent sent a reply to Siebert apologizing for contacting Bell but also stating that it had not been his "impression" that the law firm represented Wal–Mart regarding all aspects of his client's claims. The respondent also indicated that he did not think it inappropriate to interview Wal–Mart's employees.

On January 12, 1993, the respondent sent a letter to Kathy Cravens, a Wal–Mart manager, knowing that Cravens was an employee at a supervisory or managerial level. The letter asked if she would be willing to discuss employment circumstances at the center, but Cravens did not answer it.

Based on the foregoing conduct, which occurred before and after the effective date of the Rules of Professional Conduct, January 1, 1993, the hearing board concluded that the respondent communicated with a party he knew to be represented by another lawyer on the subject of that representation, in violation of DR 7–104(A)(1) and Colo. RPC 4.2.

The commentary to Rule 4.2 states in relevant part:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for the purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

In his opening brief, the respondent recognizes that Bell "was clearly an officer of the organization who could bind the organization, but Respondent argues Ms. Cravens was not." However, in his reply brief, the re-

spondent "confesses" that he should have viewed Cravens as a represented person because of the admonitions of Nail and Sherman & Howard, but that his error was inadvertent.

## B. The Tony Hall Matter

Tony Hall injured his knee while working for Continental Manufacturing on April 1, 1991. Although Hall had incurred about $5,000 in medical bills by the summer of 1991, Hall's employer (who had acknowledged liability) did not pay the bills. The medical providers sought payment from Hall, so he retained he respondent on August 13, 1991. The fee agreement between the respondent and Hall indicated that the respondent was to make demand for payment of Hall's medical bills. The respondent would pursue a workers' compensation claim if necessary, but only if Hall signed a new fee agreement. Hall and his wife paid the respondent a $150 fee.

The respondent wrote to Hall's employer on August 16 and October 28, 1991, requesting payment of his client's medical bills. After contacting the respondent's office in November 1991, the Halls believed that the respondent was still pursuing the matter. The respondent wrote to Hall on February 13, 1992, and stated that his case had been put "on hold" after the November communication because the Halls had not been receiving bills from the medical providers. However, since the respondent had just been informed that the Halls were again receiving bills, the respondent indicated that Hall needed to submit certain additional information to the respondent and that he might have to file a workers' compensation claim, which would require a new agreement. The Halls provided the information sought by the respondent but did not sign a new fee agreement.

In March 1992, the respondent learned that Continental Manufacturing had been purchased by new investors and the name had been changed to Continental Structures.

The respondent also discovered that the company did not have workers' compensation insurance when Hall was injured. The respondent advised Hall of what he had found out in a letter on March 18, 1992, and advised Hall to submit his medical bills to his major medical insurer (which Hall did not have), and to try to work out installment payments with the medical providers until the respondent could find out if other remedies were available. The respondent wrote Hall again on April 17, 1992, and stated that it appeared Hall had two options: he could either file a claim with the Department of Labor and request a hearing or he could consult a workers' compensation specialist. The respondent did communicate in July 1992 with another lawyer also trying to collect money from Continental. He described Hall's problem and asked the lawyer to let him know if he had any success with Continental and, if so, he could refer Hall to the other lawyer.

The respondent also sent another demand letter, this time to Continental Structures, but he received no response. He sent letters to Hall in July and August 1992 asking him to contact the respondent, but the Halls did not. No further work was done on the Hall case until the summer of 1993, when the respondent's new paralegal received two telephone calls from a collection agency concerning Hall's medical bills. The paralegal did not know anything about the case and could not locate the file, although it appeared on her desk a few days after she spoke to the respondent about it. When the paralegal called her, Mrs. Hall expressed surprise that the bills were still outstanding after such a substantial period of time.

Although the paralegal tried to discuss the Hall matter with the respondent, she was unsuccessful so she took it upon herself to contact the Colorado Division of Workers' Compensation. She was told that, under certain circumstances, medical providers were prohibited from seeking compensation from employees like Hall.[1] She was also informed that if Hall filed a workers' compensation

1. Section 8–42–101(4), 3B C.R.S. (1996 Supp.) provides:

Once there has been an admission of liability or the entry of a final order finding that an employer or insurance carrier is liable for the payment of an employee's medical costs or fees, a medical provider shall under no circumstances seek to recover such costs or fees from the employee.

claim, the division could seek payment from the employer. The paralegal filled out the appropriate forms and submitted them to the division on July 16, 1993. The respondent subsequently offered to bring the matter to a final resolution at no cost to the Halls, but they declined his offer.

The hearing board concluded that notwithstanding the minimal $150 payment that the Halls made, the respondent was obligated to bring the matter to some sort of resolution, either by completing the work and billing the Halls as provided in the fee agreement, or by terminating his representation. His failure to pursue either course violated DR 6–101(A)(3) and Colo. RPC 1.3 (neglecting a legal matter entrusted to the lawyer).

 The respondent maintains that his behavior in the Hall matter was entirely appropriate and did not constitute neglect. "When approved by the hearing panel, the board's factual findings are binding on this court unless, after considering the record as a whole, the findings are unsupported by substantial evidence." *People v. Bennett,* 810 P.2d 661, 665 (Colo.1991). The hearing board's finding that the respondent was obligated to bring the matter to some sort of conclusion finds support in the record and is not clearly erroneous.

An opinion letter written by an expert retained by the respondent which was introduced into evidence by the complainant states in relevant part:

> Approximately 70% of my practice involves representation of injured claimants in Workers' Compensation cases. Based on my review of [the respondent's] file, I feel [the respondent's] efforts to obtain payment of Mr. Hall's medical bills at the outset to be appropriate. However, when the bills were not paid and he received no response from Continental Manufacturing Company, [the respondent] should have either entered into a new fee agreement and assisted Mr. Hall in filing a Workers' Claim for Compensation and pursued the claim, or he should have advised Mr. Hall he would not pursue the matter any further, informed Mr. Hall of his rights under the Colorado Workers' Compensation Act and terminated the attorney/client rela-

> tionship. [The respondent] should have advised Mr. Hall of § 8–42–101(4), C.R.S. Said statute provides that a medical provider is precluded from attempting to recover costs or fees from an employee once an Admission of Liability or entry of Final Order finding that the employer or the insurance carrier is liable for payment of the employee's costs or fees.

> . . . .

> In summary, I feel [the respondent] probably should have handled this differently than he did. He should have either filed and pursued a Workers' Compensation claim on behalf of Mr. Hall through the administrative hearing process or he should have terminated the attorney/client relationship, advising Mr. Hall of his rights under the Workers' Compensation Act and suggesting Mr. Hall contact another attorney.

The record therefore supports the board's conclusion that the respondent neglected the Hall matter by not resolving the case in any of the ways suggested by his expert.

### C. The Betty Fisher Matter

On April 8, 1993, Betty Fisher hired the respondent to file a malpractice action against an oral surgeon who had performed bilateral temporomandibular joint (TMJ) surgery on her. The respondent initially referred Fisher to a neurologist whose report stated that it was her opinion that Fisher suffered "probable" nerve injury which was "very likely" the result of the TMJ surgery. The report did not express an opinion on whether the injury was the result of malpractice, however. Nevertheless, the respondent filed a malpractice action against the surgeon asserting that the surgeon had performed the surgery negligently.

Subsequently, the respondent consulted with a dentist about Fisher's case. The dentist indicated to the respondent that he was not qualified to offer an expert opinion on the case and suggested that Fisher be referred to an oral surgeon for an expert opinion. The dentist also suggested that the respondent obtain and review any informed consent

forms that Fisher may have signed before surgery.

On or about June 29, 1993, the respondent filed a certificate of review pursuant to section 13–20–602, 6A C.R.S. (1987 & 1993 Supp.) [2] asserting that he had consulted with a professional with expertise in the area of the alleged negligent conduct, that the professional had reviewed the known facts and concluded that the filing of the claim did not lack substantial justification.

Later, on July 8, 1993, an oral surgeon consulted by the respondent sent him a letter expressing the opinion that (1) Fisher may have suffered nerve damage as a result of the surgery; (2) this type of injury was *not* the result of malpractice; and (3) Fisher had given informed consent. The respondent did not attempt to dismiss the malpractice case at this time, however. Depositions were taken and the defendant's lawyer filed a disclosure certificate. The respondent did not file a disclosure certificate, so the opposing counsel filed a motion for sanctions. The respondent did not answer the motion for sanctions. The defendant's lawyer also filed a motion for disclosure of the respondent's expert and a motion for summary judgment. The respondent did not file any responses to these motions either.

On February 16, 1994, the court granted the defendant's motion for summary judgment. Shortly thereafter, the respondent filed a motion for voluntary dismissal, wherein each party agreed to bear his or her own costs, and the court granted the motion.

**2.** At the relevant time, section 13–20–602, 6A C.R.S. (1987 & 1993 Supp.), provided in part:
 (1) In every action for damages or indemnity based upon the alleged professional negligence of a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review, for each licensed professional named as a party, as specified in subsection (3) of this section, within sixty days after the service of the complaint, counterclaim, or cross claim against such licensed professional unless the court determines that a longer period is necessary for good cause shown.
 . . . .
 (3)(a) A certificate of review shall be executed by the attorney for the plaintiff or complainant declaring:

The hearing board found that although the respondent did not have evidence that Fisher's injuries were the result of malpractice, there was an indication that they were the result of the surgery. The board therefore did not find by clear and convincing evidence that the respondent had violated Colo. RPC 3.1 (bringing or defending a frivolous proceeding). The board did conclude, however, that the respondent's certificate of review was patently false since no professional had stated that Fisher's claim did not lack substantial justification. He therefore violated Colo. RPC 3.3(a)(1) (making a false statement of material fact or law to a tribunal). The respondent also neglected the Fisher case, contrary to Colo. RPC 1.3, by failing to take appropriate action on his client's behalf after receiving the oral surgeon's July 8 opinion letter.

The respondent asserts that he had reasonable grounds to file suit on behalf of Fisher and to file the certificate of review, based on the medical reports indicating that Fisher's injury was the result of the surgery. The hearing board acknowledged this in part when they declined to find that the respondent had violated Colo. RPC 3.1 (bringing or defending a frivolous proceeding). The filing of the certificate of review is a separate issue, however.

When the respondent filed the certificate, it was simply not true
> [t]hat the professional who has been consulted pursuant to subparagraph (I) of this paragraph (a) has reviewed the known facts, including such records, documents, and other materials which the professional

 (I) That the attorney has consulted a person who has expertise in the area of the alleged negligent conduct; and
 (II) That the professional who has been consulted pursuant to subparagraph (I) of this paragraph (a) has reviewed the known facts, including such records, documents, and other materials which the professional has found to be relevant to the allegations of negligent conduct and, based on the review of such facts, has concluded that the filing of the claim, counterclaim, or cross claim does not lack substantial justification within the meaning of section 13–17–102(4).

has found to be relevant to the allegations of negligent conduct and, based on the review of such facts, has concluded that the filing of the claim, counterclaim, or cross claim does not lack substantial justification within the meaning of section 13–17–102(4).

§ 13–20–602(3)(a)(II), 6A C.R.S. (1987 & 1993 Supp.). No such professional, either before or after the certificate was filed, concluded that the respondent's malpractice claim did not lack substantial justification. The hearing board correctly found that the respondent had violated Colo. RPC 3.3(a)(1).

### D. The Surcharge Matter

Between October 1991 and January 1993, the respondent employed Audrey Szmyd as a part-time bookkeeper. In the fall of 1992, the respondent instructed Szmyd to add an additional 10% charge to the monthly bills of those clients that were billed on an hourly basis. Szmyd was told not to separately show these extra charges, but to just add 10% to each charge. The additional charge was to begin with that month's billing cycle. The clients were not to be notified of the additional charge. The respondent told Szmyd that he would prepare a memo regarding his instructions and his assistant, Mary Clawson, prepared such a memo and gave it to Szmyd.

On the day of her discussion with the respondent, Szmyd added the extra charge to several bills. She decided, however, that the practice was unfair since the clients had no way of knowing about the added charge unless they asked for time slips. Szmyd discontinued the practice without telling the respondent she had stopped doing it.

The hearing board determined that by directing Szmyd to impose the 10% added charges without notifying the affected clients, the respondent violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

As he did before the hearing board, the respondent claims that it is simply not true that he instructed his bookkeeper to add the secret 10% surcharge to client bills. This is a clear-cut case of the respondent's word against that of his former bookkeeper and secretary.

"When, as here, it acts as fact-finder, the hearing board has the duty to assess the credibility of the evidence before it, controverted and uncontroverted." *People v. Robnett*, 859 P.2d 872, 877 (Colo.1993). "In determining whether the board's findings are supported by substantial evidence, it is not within the province of this court to measure the weight of the evidence or to resolve the credibility of witnesses." *People v. Distel*, 759 P.2d 654, 662 (Colo.1988). We therefore accept the board's factual finding that the respondent did instruct Szmyd to add the surcharge as she testified.

### E. Federal Withholding Taxes

Beginning in 1992, the respondent frequently did not withhold enough money in his bank account for tax purposes. Specifically, the respondent made the payment of employee wages (including his own and his wife's wages), and the payment of office expenses, priorities. The remainder was to be deposited into the respondent's trust account for tax purposes. Toward the end of 1992, the respondent did not have enough left over to withhold for taxes, and his bookkeeper told him so. However, the respondent did not remedy the situation, and he failed to pay employee income taxes in the fourth quarter of 1992; as well as the second, third, and fourth quarters of 1993. This failure to pay withholding taxes violated 26 U.S.C. § 7202 (1994), which is a felony.[3]

On January 11, 1994, the Internal Revenue Service served a notice of levy on the respondent's bank account claiming that the respondent still owed the I.R.S. $1,708.49 for the fourth quarter of 1992, and $4,247.58 for the second quarter of 1993.

---

**3.** 26 U.S.C. § 7202 (1994) provides:

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax

shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

The hearing board found that by failing to pay his employees' federal withholding taxes when due, the respondent violated DR 1-102(A)(4) and Colo. RPC 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102(A)(6) and Colo. RPC 8.4(h) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law); and Colo. RPC 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer); as well as C.R.C.P. 241.6(5) (violating the criminal laws of a state or of the United States). The fact that the respondent may have paid some, but not all, of the employee taxes when due in some of the relevant tax quarters does not undercut the board's findings.

### F. The Respondent's Employees

The respondent defended himself by asserting that his former employees conspired to testify falsely against him. The hearing board made the following findings regarding the respondent's characterization of his employees:

Several witnesses called by the complainant had at various times been members of the respondent's office staff, and periodically throughout the hearing the respondent claimed that his former employees were conspiring against him and that he was the innocent victim of a mutiny. The hearing board found no evidence to support respondent's accusations, and, to the contrary, believes these witnesses acted entirely in good faith and only after giving serious thought to complaining about their former employer. The evidence did disclose an unusually high rate of personnel turnover in respondent's office during the time covered by the five counts of the subject complaint. It is the board's opinion that the turnover is to be attributed to the respondent's failure to communicate appropriately with members of his staff, and not to mutinous conduct on their part.

## II

The hearing panel approved the board's recommendation that the respondent be suspended from the practice of law for ninety days. The respondent has excepted to the findings and recommendation of the hearing board and panel. In Part (I) we found that the hearing board's findings were supported by the record and were correct. The respondent nonetheless asserts that the recommended discipline is too severe. The complainant, on the other hand, has excepted to the recommended discipline as too lenient, and recommends that the respondent be suspended for one year and one day.

The three most serious of the respondent's violations are the filing of the false certificate in the Betty Fisher case, the secret 10% surcharge, and the failure to pay employee withholding taxes when due. Any one of these violations by itself would justify a period of suspension. Under ABA *Standards for Imposing Lawyer Sanctions* 6.12 (1991 & Supp.1992) (ABA *Standards*):

Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

Similarly, with respect to the 10% surcharge, "[s]uspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." *Id.* at 4.62. *See People v. Shields*, 905 P.2d 608, 611–12 (Colo.1995) (lawyer suspended for one year and one day for intentionally overbilling government agency for attorney time on consistent basis for over a year, where only mitigating factor was lack of prior disciplinary record).

Failure to pay withholding taxes also arose in the recent lawyer discipline case of *People v. McIntyre*, 942 P.2d 499, 500 (Colo.1997). McIntyre became liable for approximately $55,000 in unpaid federal withholding taxes for his employees and he failed to file personal federal income tax returns for the years 1993, 1994, and 1995. We suspended McIntyre for six months and required him to

petition for reinstatement. *Id.* at 501. In deciding that six months was a sufficient period of suspension, we took into account that McIntyre had not been previously disciplined in twenty-five years of practice. *Id.* at 500–01.

The hearing board found the presence of the following aggravating factors: the respondent had a dishonest or selfish motive, ABA *Standards* 9.22(b); there was a pattern of misconduct, *see id.* at 9.22(c); multiple offenses, *see id.* at 9.22(d); the respondent has refused to acknowledge the wrongful nature of his conduct, *see id.* at 9.22(g); and he has substantial experience in the practice of law, *see id.* at 9.22(i).

In mitigation, the respondent has no previous discipline in nineteen years of practice in this state, *see id.* at 9.32(a); and he cooperated in the disciplinary proceedings, *see id.* at 9.32(e). There is also evidence that at the time of the misconduct, the respondent was experiencing personal and emotional problems in the form of a major depressive disorder requiring hospitalization, related in part to job stress. *See id.* at 9.32(c). Finally, there was considerable evidence of the respondent's character and reputation. *See id.* at 9.32(g).

Considering the extent of the misconduct, however, and the respondent's apparent total inability to appreciate its wrongfulness, we have concluded that the respondent should be suspended for a substantial period and be required to undergo reinstatement proceedings. We are very troubled, as was the board, by the respondent's predilection for blaming his employees for problems that were of his own making. Reinstatement proceedings will ensure that the respondent is once again able to practice law appropriately. We therefore order that the respondent be suspended for one year and one day. One member of the court, however, would impose a more severe disciplinary sanction.

## III

It is hereby ordered that Leo Wotan, Jr., be suspended from the practice of law for one year and one day, effective thirty days after the issuance of this opinion. C.R.C.P. 241.21(a). It is further ordered that the respondent pay the costs of this proceeding in the amount of $3,705.82 to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202, within ninety days after the announcement of this opinion. The respondent shall not be reinstated until after he has complied with C.R.C.P. 241.22(b)-(d).